757 A.2d 184

STATE OF NEW JERSEY, PLAINTIFF–RESPONDENT, v.
ROBERT W. MORTON, DEFENDANT–APPELLANT.

Argued March 14, 2000—Decided August 2, 2000.

238

*Bernadette N. DeCastro*, Assistant Deputy Public Defender and *Claudia Van Wyk*, Deputy Public Defender II, argued the cause for appellant (*Ivelisse Torres*, Public Defender, attorney).

*Lisa Sarnoff Gochman*, Deputy Attorney General argued the cause for respondent (*John J. Farmer, Jr.*, Attorney General of New Jersey, attorney).

The opinion of the Court was delivered by

COLEMAN, J.

Two terms ago, we affirmed defendant's conviction and death sentence for the murder of Michael Eck. *State v. Morton*, 155 *N.J.* 383, 715 *A.*2d 228 (1998) (*Morton I*). We preserved defendant's right to seek "proportionality review of his sentence, *N.J.S.A.* 2C:11–3e, in a separate proceeding." *Id.* at 464, 715 *A.*2d 228. On that review we find no disproportionality in defendant's death sentence.

## I. FACTS

The facts are set forth in detail in *Morton I, supra,* 155 *N.J.* at 398–410, 715 *A.*2d 228. We will, however, briefly restate those facts relevant to our proportionality review.

On the night of February 23, 1993, defendant, who was twenty-five years old at the time, and co-defendant Alonzo Bryant, agreed to go out and "get paid," a colloquialism for committing robberies. After leaving the Playhouse, a go-go bar in Burlington Township at approximately 10:20 p.m., defendant and Bryant encountered Toby Chrostowski in the parking lot. The driver of defendant's

Ford Escort tried to block Chrostowski's path; the passenger walked around the car and approached Chrostowski from behind. Chrostowski tried to walk past the driver, and felt a sharp pain in his chest as he walked by. After entering the Playhouse, Chrostowski discovered that he had been stabbed, but did not know which of the two men had stabbed him. Chrostowski survived.

Later that evening, defendant and Bryant drove to Francine's, a Cherry Hill nightclub with a wealthy clientele. They decided not to rob anyone there because the valet parking system would have made a robbery risky.

Approximately two hours after the Chrostowski robbery, defendant and Bryant drove into the Delran Amoco gas station. They waited by the air pump until a limousine departed from the station. Thereafter, they drove up to the gas pumps and attacked Michael Eck, the gas-station attendant. Eck was stabbed twenty-four times in the chest, shoulder, forearm, and groin. A stab wound to Eck's heart was fatal, and the two wounds to Eck's liver could also have been lethal. Eck, bleeding severely and gasping for breath, called 9-1-1. He died that night at the hospital from massive bleeding.

Later that evening, defendant went to the hospital to treat a knife wound to his left index finger sustained while stabbing Eck. The nurse who had treated Chrostowski's stab wound earlier that evening suspected that defendant's injury, which looked like a knife wound, was related to that stabbing. She called the police. The ensuing investigation by the police led to the identification and arrest of defendant and Bryant as the perpetrators of both stabbings.

During the initial custodial interrogation of defendant, he denied any involvement in the gas-station robbery-murder. However, he changed his story a number of times. In his first taped statement to police, defendant admitted to being present at the Amoco station, but he accused Bryant of being the one to stab Eck. In a second taped statement, defendant confessed to the crimes. He divulged that he and Bryant had agreed to commit a series of

robberies that night and that both he and Bryant stabbed Eck. Defendant admitted that he had intended to kill Eck, not to facilitate the robbery, but to eliminate him as a witness. Throughout his confession defendant showed very few signs of emotion or remorse.

A Burlington County jury convicted defendant of purposeful-or-knowing murder by his own conduct, felony murder, first-degree robbery (four counts), second-degree aggravated assault, and third-degree aggravated assault.

Defendant absented himself from the ensuing penalty phase of the trial. In lieu of presenting witnesses, defense counsel submitted a 200–page "mitigation book," which included defendant's school, medical, and psychiatric records, his Child Study Team report, a documentation of defendant's childhood misbehavior, Bryant's criminal and prison record, Bryant's brother's statement to the police inculpating Bryant as the primary perpetrator, and defense counsel's prediction that defendant would die in prison if he were not sentenced to death. Defense counsel's opening and closing argument stressed defendant's troubled childhood, during which he suffered a stress ulcer, his mother's deficient parenting, and his slow mental development and borderline intellectual functioning. Defendant, however, refused to meet with a psychiatrist or psychologist.

The jury unanimously found the existence of two aggravating factors: c(4)(f) (escape detection) and c(4)(g) (felony murder). Only ten of the twelve jurors concluded that the State had proven the c(4)(c) (torture or depravity) aggravating factor. At least one juror found four of the sixty c(5)(h) (catch-all) mitigating factors submitted by the defense. One juror found as mitigating the likelihood that defendant would die in prison prior to becoming eligible for parole, seven found as mitigating defendant's lack of a criminal record, and ten concluded that defendant would not have committed the offenses "were it not for Alonzo Bryant." Three jurors found *sua sponte* under the catch-all factor that defendant is his mother's only child.

The jurors unanimously concluded that the aggravating factors outweighed the mitigating factors. Accordingly, the sentence of death was imposed. Additionally, the trial court imposed an aggregate noncapital sentence of forty years imprisonment with a twenty-year parole disqualifier. This Court affirmed defendant's convictions and sentences. *Morton I, supra,* 155 *N.J.* at 466, 715 *A.*2d 228.

## II. *INDIVIDUAL PROPORTIONALITY REVIEW*

In *State v. Loftin,* 157 *N.J.* 253, 453–57, 724 *A.*2d 129 (*Loftin II* ), *cert. denied,* 528 *U.S.* 897, 120 *S.Ct.* 229, 145 *L.Ed.*2d 193 (1999), this Court appointed Judge David S. Baime as a Special Master and ordered him to examine and make findings and recommendations regarding "individual proportionality review," which concerns whether a specific defendant's death sentence is out of proportion when compared with similarly-situated defendants and "systemic proportionality review," which addresses allegations that invidious discrimination permeates the administration of the death penalty in this State. Judge Baime's recommendations for individual proportionality review were adopted, for the most part, by this Court in *In re Proportionality Review Project,* 161 *N.J.* 71, 735 *A.*2d 528 (1999) (*Proportionality Review I* ). Judge Baime's report on systemic proportionality review, *see* David S. Baime, *Report to the New Jersey Supreme Court: Systemic Proportionality Review Project* (Dec. 1, 1999) (*Baime Report II* ), has been examined in *In re Proportionality Review Project II,* 165 *N.J.* 206, 757 *A.*2d 168 (2000) (*Proportionality Review II* ). The present case is one of the first proportionality reviews this Court has decided based on the standards articulated in *Proportionality Review I, supra,* and *Proportionality Review II, supra.*

The principal goal of proportionality review "is to determine whether a particular defendant's death sentence is disproportionate" when compared to the sentences of other defendants who are similarly situated. *State v. DiFrisco,* 142 *N.J.* 148, 160,

662 *A*.2d 442 (1995) (*DiFrisco III*), *cert. denied*, 516 *U.S.* 1129, 116 *S.Ct.* 949, 133 *L.Ed.*2d 873 (1996); *see N.J.S.A.* 2C:11–3e. A defendant's death sentence is considered disproportionate if other defendants in the jurisdiction who have similar characteristics commit similar offenses and receive life sentences. *State v. Martini*, 139 *N.J.* 3, 20, 651 *A*.2d 949 (1994) (*Martini II*), *cert. denied*, 516 *U.S.* 875, 116 *S.Ct.* 203, 133 *L.Ed.*2d 137 (1995); *State v. Bey*, 137 *N.J.* 334, 343, 645 *A*.2d 685 (1994) (*Bey IV*), *cert. denied*, 513 *U.S.* 1164, 115 *S.Ct.* 1131, 130 *L.Ed.*2d 1093 (1995); *State v. Marshall*, 130 *N.J.* 109, 131, 613 *A*.2d 1059 (1992) (*Marshall II*), *cert. denied*, 507 *U.S.* 929, 113 *S.Ct.* 1306, 122 *L.Ed.*2d 694 (1993). The defendant must show that his "death sentence is aberrational." *Bey IV, supra*, 137 *N.J.* at 352, 645 *A*.2d 685; *see State v. Chew*, 159 *N.J.* 183, 195, 731 *A*.2d 1070 (*Chew II*), *cert. denied*, —— U.S. ——, 120 *S.Ct.* 593, 145 *L.Ed.*2d 493 (1999); *State v. Harvey*, 159 *N.J.* 277, 289, 731 *A*.2d 1121 (1999) (*Harvey III*), *cert. denied*, —— *U.S.* ——, 120 *S.Ct.* 811, 145 *L.Ed.*2d 683 (2000). We seek " 'to ensure that the death penalty is being administered in a rational, non-arbitrary, and evenhanded manner, fairly and with reasonable consistency.' " *Loftin II, supra*, 157 *N.J.* at 265, 724 *A*.2d 129 (quoting *Marshall II*, 130 *N.J.* at 131, 613 *A*.2d 1059).

■ There are two facets of individual proportionality review (1) frequency analysis, which measures the relative frequency of death sentences in factually similar cases, and (2) precedent-seeking review, which is "a traditional judicial way of comparing the files in similar cases to determine whether a defendant's death sentence is freakish or aberrational or the result of impermissible influences." *Proportionality Review I, supra*, 161 *N.J.* at 77, 735 *A*.2d 528.

■ We note that the defendant bears the burden of proving that his death sentence is disproportionate. *DiFrisco III, supra*, 142 *N.J.* at 162, 662 *A*.2d 442.

## A. UNIVERSE OF CASES

As we stated in *Chew II, supra,* the "first step in any proportionality review is to determine the universe of cases that we will use to compare with the defendant's case. The 1992 amendment to *N.J.S.A.* 2C:11–3e limits this comparison group to only those cases in which a death sentence has actually been imposed." 159 *N.J.* at 196, 731 *A.*2d 1070. This Court, however, recently stated that

> a universe limited to cases in which the death-penalty sentence has been imposed cannot support a coherent proportionality system. This is so because "[w]ithout knowledge of the life-sentenced cases, [a court] would be unable to determine whether there is a 'meaningful basis' for distinguishing the death sentences it reviews from the 'many cases' in which lesser sentences are imposed."
>
> [*Proportionality Review I, supra,* 161 *N.J.* at 84, 735 *A.*2d 528 (quoting David S. Baime, *Report to the New Jersey Supreme Court: Proportionality Review Project* at 10 (Apr. 28, 1999) (*Baime Report I* ) (citation omitted)) ].

We will therefore consider all death-eligible cases, whether or not they were capitally prosecuted, because the State's decision not to prosecute the defendant capitally does not necessarily reflect on the defendant's lack of deathworthiness. *Harvey III, supra,* 159 *N.J.* at 291–92, 731 *A.*2d 1121.

## B. FREQUENCY ANALYSIS

The first step in proportionality review is frequency analysis. "Frequency analysis helps us to determine whether defendant is in a category that renders him or her more likely than other killers to receive the death penalty." *DiFrisco III, supra,* 142 *N.J.* at 171, 662 *A.*2d 442. Frequency review begins and ends with the salient-factors test, which measures the relative frequency of death sentencing in factually similar cases. *Proportionality Review I, supra,* 161 *N.J.* at 77–78, 94, 735 *A.*2d 528; *Chew II, supra,* 159 *N.J.* at 202–03, 731 *A.*2d 1070. The index-of-outcomes test, previously used by this Court in proportionality review, was discontinued because of "the instability of the regression models." *Proportionality Review I, supra,* 161 *N.J.* at 91, 735 *A.*2d 528. As a result, our frequency analysis here will be limited to the salient-factors test.

"The salient-factors test enables us to compare defendant's sentence to sentences in factually similar cases to measure the relative frequency of defendant's sentence." *Harvey III, supra,* 159 *N.J.* at 301, 731 *A.*2d 1121. We must first determine to which category defendant belongs based upon the statutory aggravating factors.[1] We then subdivide that group " 'according to circumstances that serve either to aggravate or to mitigate the blameworthiness of the defendants in those cases.' " *Loftin II, supra,* 157 *N.J.* at 328, 724 *A.*2d 129 (quoting *Martini II,* 139 *N.J.* at 33, 651 *A.*2d 949); *see Harvey III, supra,* 159 *N.J.* at 301, 731 *A.*2d 1121.

In *Proportionality Review I,* we retained the principle of unique assignment. "Briefly stated, the principle is that even though a case may contain multiple identifying factors, e.g., killing a public official and robbing or torturing the official, the case is assigned to one category for salient-factor review." *Proportionality Review I, supra,* 161 *N.J.* at 89, 735 *A.*2d 528. Both the Public Defender and the Attorney General agree that Morton should be placed in the F–2 category, which encompasses murders committed during the course of a robbery of a business. We agree with that designation.

---

[1] The thirteen basic categories are:
- (A) Victim is a Public Servant;
- (B) Prior Murder Conviction without A above;
- (C) Contract Killing without A–B above;
- (D) Sexual Assault without A–C above (subdivided into (1) aggravated and (2) other);
- (E) Multiple Victims without A–D above (subdivided into (1) aggravated and (2) other);
- (F) Robbery without A–E above (subdivided into (1) home, (2) business, and (3) other);
- (G) Torture/Depravity without A–F above;
- (H) Abduction without A–G above;
- (I) Arson without A–H above;
- (J) Escape Detection without A–I above;
- (K) Burglary without A–J above;
- (L) Grave Risk without A–K above;
- (M) Victim Under 14 Years Old without A–L above.

In the F–2 subcategory, there are currently thirty-three cases. The following chart represents a breakdown of the death-sentencing rates for defendants in the F–2 subcategory.

SALIENT–FACTORS TEST: F–2 SUBCATEGORY
(data from *Morton Report*, tbl. 7)

| | Death–Sentencing Rate At Penalty Trial | Death–Sentencing Rate for All Eligible Cases | Proportion of Cases Advancing to P–Trial |
|---|---|---|---|
| *F–2 Incl. D* | 28% ($\frac{5}{18}$) | 15% ($\frac{5}{33}$) | 55% ($\frac{18}{33}$) |
| *F–2 Excl. D* | 24% ($\frac{4}{17}$) | 13% ($\frac{4}{32}$) | 53% ($\frac{17}{32}$) |
| *All Ds* | 30% ($\frac{52}{176}$) | 11% ($\frac{52}{455}$) | 39% ($\frac{176}{455}$) |
| *All Ds Excl. D* | 29% ($\frac{51}{175}$) | 11% ($\frac{51}{454}$) | 39% ($\frac{175}{454}$) |

The salient-factors test reveals that the death-sentencing rates in defendant's subcategory do not appreciably differ from the overall death-sentencing rates. In the F–2 death-eligible universe, the death-sentencing rate for business-robbery-murders is fifteen percent, which is greater than the eleven-percent death-sentencing rate of the 455 cases in the full universe, inclusive of defendant. When defendant's case is excluded from the F–2 death eligible universe, the thirteen-percent death-sentencing rate slightly exceeds the rate at which all death-eligible cases result in a death sentence. Among the cases that proceeded to a penalty trial, juries sentenced people in defendant's subcategory to death at a twenty-eight percent rate, which is a bit lower than the overall thirty percent death-sentencing rate in the penalty-trial universe. The disparity increases when excluding defendant's case: twenty-four percent for business-robbery-murders versus twenty-nine percent for all cases excluding defendants that advanced to a penalty phase. On the other hand, business-robbery-murders are more likely to proceed to a penalty phase than other death-eligible murders. The fifty-five percent penalty-trial-advancement rate exceeds the overall thirty-nine percent rate. Even when defendant's case is excluded, fifty-three percent of business-robbery-murders proceed to a penalty phase.

Those results are comparable to those obtained in other proportionality review cases, in which this Court found no disproportionality. *See Harvey III, supra,* 159 *N.J.* at 302, 731 *A.*2d 1121

(reporting death-sentencing rate at penalty trial for E–1 defendants, excluding Harvey, as 33%, and death-sentencing rate for all E defendants, excluding Harvey, as 24%); *State v. Cooper*, 159 *N.J.* 55, 78, 731 *A.2d* 1000 (1999) (*Cooper II* ), cert. denied, —— *U.S.* ——, 120 *S.Ct.* 809, 145 *L.Ed.2d* 681 (2000) (noting death-sentencing rate at penalty trial for C–1 defendants, excluding Cooper, as 39%, and death-sentencing rate for all defendants, excluding Cooper, as 30%); *DiFrisco III, supra,* 142 *N.J.* at 173–74, 662 *A.2d* 442 (reporting death-sentencing rate for I–1 defendants, excluding DiFrisco, as 25%, and death-sentencing rate for all I defendants, excluding DiFrisco, as 29%); *Marshall II, supra,* 130 *N.J.* at 168–69, 613 *A.2d* 1059 (reporting the death-sentencing rate at penalty trial of contract-murder principals, excluding Marshall, as 0%, and death-sentencing rate for entire contract-murder pool, excluding Marshall, as 33%).

█ Thus, the salient-factors test does not indicate that defendant's death sentence is disproportionate. The statistics suggest that prosecutors consider capital murders in the F–2 subcategory to be more deathworthy than other death-eligible homicides but that juries do not consider business-robbery-murders to be more deathworthy than other capital murders.

## C.  *PRECEDENT–SEEKING REVIEW*

█ "The precedent-seeking approach, also referred to as comparative-culpability review, is the second component of proportionality review." *Loftin II, supra,* 157 *N.J.* at 335, 724 *A.2d* 129. In precedent-seeking review, "we examine death-eligible cases similar to defendant's case to determine whether his death sentence is aberrant when compared to the sentences received by defendants in those other cases." *Chew II, supra,* 159 *N.J.* at 210, 731 *A.2d* 1070; *accord Harvey III, supra,* 159 *N.J.* at 307, 731 *A.2d* 1121. We "give enhanced weight to the process of precedent-seeking review." *Cooper II, supra,* 159 *N.J.* at 88, 731 *A.2d* 1000; *see also Harvey III, supra,* 159 *N.J.* at 308, 731 *A.2d* 1121 ("[W]e have consistently placed greater reliance on precedent-seeking review

than on frequency review."); *DiFrisco III, supra,* 142 *N.J.* at 184, 662 *A.*2d 442; ("[W]e rely here more heavily on precedent-seeking review than on frequency analysis."); *Chew II, supra,* 159 *N.J.* at 209, 731 *A.*2d 1070 (acknowledging reliance on precedent-seeking review); *Cooper II, supra,* 159 *N.J.* at 88, 731 *A.*2d 1000 ("In prior proportionality-review cases, we consistently have accorded greater significance to precedent-seeking review than to frequency review."); *Loftin II, supra,* 157 *N.J.* at 296, 724 *A.*2d 129 ("We have consistently placed our reliance on this form of [precedent-seeking] review because of the analytic difficulties we have encountered in applying frequency analysis.").

## 1. *RELEVANT FACTORS*

"In comparing defendant to other similar defendants, we use a three-part model of criminal culpability." *Chew II, supra,* 159 *N.J.* at 210, 731 *A.*2d 1070; *accord Loftin II, supra,* 157 *N.J.* at 336, 724 *A.*2d 129; *DiFrisco III, supra,* 142 *N.J.* at 203, 662 *A.*2d 442. To evaluate defendant's culpability, we consider (1) his moral blameworthiness, (2) the degree of victimization, and (3) his character. *Chew II, supra,* 159 *N.J.* at 210, 731 *A.*2d 1070; *Marshall II, supra,* 130 *N.J.* at 155, 613 *A.*2d 1059.

> We first review defendant's moral blame-worthiness by examining motive, premeditation, justification or excuse, evidence of mental disease, defect, or disturbance, knowledge of helplessness of the victim, knowledge of effects on nondecedent victims, defendant's age, maturity, etc., and defendant's involvement in planning the murder. We then consider the degree of victimization, including the violence and brutality of the murder, and injury to nondecedent victims. Finally, we examine the character of the defendant, including his or her prior record, other unrelated acts of violence, cooperation with authorities, remorse, and capacity for rehabilitation.
>
> [*Chew II, supra,* 159 *N.J.* at 210–11, 731 *A.*2d 1070 (citing *Marshall II, supra,* 130 *N.J.* at 155, 613 *A.*2d 1059) (citations omitted) ].

### a. *DEFENDANT'S MORAL BLAMEWORTHINESS*

An analysis of defendant's moral blameworthiness indicates that he is highly blameworthy. Defendant's motive for murdering Eck was to escape detection for robbing the gas station. Killing to avoid apprehension for a robbery is contemptible. *See Harvey*

*III, supra,* 159 *N.J.* at 312–13, 731 *A.*2d 1121 (finding defendant's moral blameworthiness high in part because of his motive to escape apprehension for robbery). However, this motive is "relatively common for defendants whose homicides occur in conjunction with the commission of a felony." *Cooper II, supra,* 159 *N.J.* at 89, 731 *A.*2d 1000. Nonetheless, defendant's admission that he killed Eck to prevent him from identifying defendant is telling of his reprehensible motive. Defendant and Bryant did not need to kill Eck to effectuate the robbery; while Eck was begging for his life, he told Bryant and defendant that they could take whatever they wanted. Defendant ignored the victim's pleas for mercy, and continued brutally to stab him.

Defendant's premeditation likely lasted for several hours. He and Bryant both carried knives and surgical gloves for their planned robbery spree. There are also indications that defendant viewed the Chrostowski stabbing as the prelude to further assaults. In his confession, defendant divulged, "I knew what I was getting into.... One indication of the night being a murderous night was when 'Lonzo [Bryant] cut a guy.'" *Morton I, supra,* 155 *N.J.* at 406, 715 *A.*2d 228.

Defendant lacked any justification or excuse for murdering Eck. The only evidence of provocation, Bryant's claim that Eck called him a nigger, is implausible. Defendant never contended that he had heard Eck utter any racial slurs or that he stabbed Eck for any reason other than to eliminate him as a witness.

The record is devoid of evidence that defendant suffered from a mental disease, defect or disturbance at the time of the murder.[2] The defense presented documentation of defendant's borderline intellectual functioning; yet, defendant is not mentally retarded. Defendant suffered a severe head injury and a stress-related ulcer by the time he was three years old. Later in his childhood he

---

[2] Defendant refused to cooperate in the preparation of mitigating evidence. We cannot presume the existence of mitigating evidence that was not presented at trial.

experienced behavioral problems at school, where he was primarily enrolled in special-education classes. That is the extent of defendant's mental deficiency, which does not provide him with any justification or excuse for the murder.

In terms of knowledge of the helplessness of the victim, although Eck was not inherently helpless, defendant and Bryant made sure that Eck was alone at the gas station before attacking him. They waited for the limousine driver to depart before commencing the robbery, which occurred in an isolated area late at night. *Compare Loftin II, supra,* 157 *N.J.* at 337, 724 *A.2d* 129 (concluding defendant knew victim was helpless in part because crime took place "in an isolated area very late at night"). In addition, defendant and Bryant were armed with knives, and they had no reason to believe that Eck was armed. *Ibid.* (concluding defendant knew victim was helpless in part because defendant, but not victim, was armed). Further, the two perpetrators outnumbered Eck, the lone gas-station attendant working the graveyard shift.

No living victims witnessed the robbery-murder and defendant had no specific knowledge that Eck had two children. However, specific knowledge of family members is not necessary.

> Although defendant may not have known specifically that [the victim] had family and friends, we have previously recognized that "[w]hile a defendant might be unaware of the specific characteristics of his victims or of the particular survivors that the victim will leave behind, it is completely foreseeable that the killing will eliminate a unique person and destroy a web of familial relationships."
>
> [*Harvey III, supra,* 159 *N.J.* at 313, 731 *A.2d* 1121 (quoting *State v. Muhammad,* 145 *N.J.* 23, 46, 678 *A.2d* 164 (1996)) ].

Therefore, we conclude that defendant was imbued with knowledge of the effect that this brutal stabbing would have on Eck's survivors.

Defendant was twenty-five years old when he murdered Eck. The jury unanimously rejected the c(5)(c)(age) mitigating factor and, thus, his age does not diminish his blameworthiness.

Bryant's involvement in planning the robbery and murder mitigates defendant's moral blameworthiness to an extent. Bryant

was the apparent mastermind behind the plan to commit multiple robberies and murder. Ten jurors found that defendant would not have committed or participated in the robbery-murder of Eck had it not been for Bryant. Defendant's proportionality counsel goes further and contends that Bryant, a career criminal, "took advantage of Mr. Morton's mental deficiencies to instigate defendant's participation" in the crimes. However, defense counsel overstates the case. At the penalty phase, the jury rejected the following proposed c(5)(h) (catch-all) mitigating factor: "Due to his intellectual abilities, Robert Morton was drawn into the criminal acts by Alonzo Bryant who had previously been convicted of aggravated assault and served eight years in a federal prison, only having been released sixty days prior to the offense." The jury appears to have been persuaded that, despite defendant's borderline intellectual functioning, he was able to make independent decisions. Although Bryant primarily planned the robbery and murder, defendant willingly participated in the crimes. Therefore, his culpability in planning the murder should not be diminished because of the presence of a co-defendant.

Overall, defendant's moral blameworthiness is very high. He murdered Eck to escape apprehension for, not merely to commit, the robbery of the Delran Amoco. Defendant and Bryant repeatedly stabbed Eck despite his defenselessness. Defendant presented no evidence that he suffered from a mental disease or emotional disturbance. Although Bryant principally planned the robbery-murder, defendant readily collaborated in committing the crimes.

### b. *DEGREE OF VICTIMIZATION*

We evaluate victimization based on the relative violence and brutality of the murder. *Harvey III, supra,* 159 *N.J.* at 313–14, 731 *A.*2d 1121. The degree of victimization in this case was exceptional, even given the absence of living victims. Eck must have suffered tremendous pain from the twenty-four stab wounds, including three in the groin area. Defendant and Bryant continued brutally to stab Eck even though he offered no resistance and

begged for his life. Eck remained conscious long after the stabbing and was not pronounced dead until nearly two hours later. The fact that Eck was fully aware of what was happening to him adds to the degree of victimization. Defendant argues that the superficiality of twenty-one of the stab wounds palliates the degree of victimization. We disagree. That argument is based on the mistaken premise that non-fatal wounds are insubstantial. At trial, the medical examiner testified that a wound is superficial if it cannot by itself cause death. Although the superficial wounds would not have killed Eck if defendant and Bryant had not stabbed him in the heart and liver, the infliction of superficial stab wounds caused Eck to experience enormous pain and loss of blood and greatly enhanced the degree of victimization.

## c. DEFENDANT'S CHARACTER

Prior to murdering Eck, defendant had never been arrested as an adult, and his only juvenile arrest, for assault, resulted in a dismissal at the victim's request. The absence of a criminal record reflects favorably on defendant's character.

Although not included in a prior criminal record, defendant engaged in other violent acts. He participated in the stabbing of Toby Chrostowski on the same night that he murdered Michael Eck. When his original defense attorneys confronted him with inculpatory evidence, defendant's ferocious reaction induced them to withdraw from the case. His trial counsel, aware of defendant's violent tendencies, feared that he would become violent during the presentation of mitigating evidence of his marginal intellect and his mother's shortcomings. Additionally, in the redacted portion of his confession, defendant stated that he would commit another homicide while in prison if confronted.[3]

---

[3] The State argues that defendant confessed to his involvement in a stabbing that occurred two months prior to the murder. The State's source for that allegation, this Court's opinion in *Morton I, supra* 155 *N.J.* at 411, 715 *A.2d* 228, indicates only that the trial court redacted defendant's response to questions regarding an earlier stabbing.

Defendant did not initially cooperate with authorities, which would have reflected favorably in his character assessment. After killing Eck, he discarded his surgical gloves out the window of his car. Bryant later disposed of defendant's knife. During his interrogation, defendant originally denied involvement in the stabbings of both Chrostowski and Eck. After extensive police investigation that connected him to the crimes, defendant ultimately confessed to his involvement in the crimes. Defendant, however, subsequently insisted that the police fabricated his confession. His inconsistent interactions with the police do not qualify as the type of cooperation that may be deemed a mitigating factor.

Defendant showed very little remorse in his confession. He said: "I'm a fuckin' killer. I did it. I'm sorry but ... that don't bring the man back.... Who am [sic] the fuck am I to take a man out that ain't did nuttin'." *Morton I, supra,* 155 *N.J.* at 407, 715 *A.*2d 228. Except for his confession, which he later recanted, defendant exhibited no remorse. Upon reaching the comfort of Bryant's girlfriend's home on the night of the crimes, defendant and Bryant laughed and joked about the murder. Rather than expressing regret for their actions, they discussed committing another robbery.

Defendant might have a capacity for rehabilitation. He has no prior criminal record and was employed until his arrest. Furthermore, he did not plan the crimes. However, his refusal to take responsibility for his actions the night he fatally stabbed Eck and his utter lack of remorse suggests that rehabilitation may be unlikely. Indeed, his own statements strongly suggest that he may be prone to violence.

Defendant's character has both aggravating and mitigating aspects. His law-abiding past reflects well on his character, but his insistence on his innocence, in the face of his confession and the overwhelming evidence against him, is disturbing.

### d. *CONCLUSION*

Defendant's overall culpability is high. Moreover, the high degree of victimization contributes substantially to raise his culpa-

bility. Defendant's moral blameworthiness is significant. Although his character evinces some positive attributes, those are dwarfed by the highly aggravated aspects of his character. Based on the three-part model of criminal culpability, we conclude that, overall, defendant exhibits a high level of culpability.

## 2. *DEFENDANT'S COMPARISON GROUP*

Precedent-seeking review "employs the same comparison group as that used in the salient-factors test." *Chew II, supra,* 159 *N.J.* at 214, 731 *A.*2d 1070. To reiterate, both parties agree that defendant's capital crime belongs in the F–2 subcategory for business-robbery-murders that do not qualify for salient factors A through E. The Attorney General proposes fifteen comparison cases,[4] fourteen of which are catalogued in F–2 and one of which is designated F–3. The Public Defender does not object to the inclusion of any of those cases in defendant's comparison group. In addition, the Public Defender seeks to include an additional eleven cases [5] (eight from the F–2 subcategory, and three in the B–1 subcategory for prior murderers) to which the Attorney General objects. We now determine which cases will be included in defendant's comparison group.

Initially, we note our agreement with the parties that the following fifteen cases should be included in defendant's comparison group: Carl Culley, Richard Feaster, Tim Harris, Craig Hart, Jacinto Hightower, Roger Hoyte, Anthony Inman, David Mark Russo, Abdel Jaber Saleh, Frederick Simmons, Rafael Slaughter, Corey Washington, Ronald Leon Wheeler, Charles Williams, and Donald Loftin. All of those defendants belong in the F–2 subcategory except for Loftin, who falls under the F–3 subcategory. We include all of those cases in defendant's precedent-seeking review.

---

4 We count Jacinto Hightower's two penalty trials as one case, and Roger Hoyte's single trial for three separate murders as one case.

5 We count Ronald Long's single trial for two murders as one case.

For cases over which there is disagreement, we hold that cases that fall within defendant's salient-factors-test classification [6] should be presumptively included within defendant's comparison group. Conversely, cases that do not come within his salient-factors-test classification should be presumptively excluded from defendant's comparison group. We believe those presumptions are faithful to this Court's prior practice of using the salient-factor categories for comparison groups and our goal of having precedent-seeking review complement the salient-factors test while maintaining a certain tolerance and openness to cross-category comparisons. *Proportionality Review I, supra,* 161 *N.J.* at 91, 735 *A.*2d 528.

Whether or not to ultimately include a case, over which there is disagreement, in comparison review is decided based on a showing of sufficient similarity. Essentially, if the proposed comparison case has the same salient-factors-test classification as defendant's case, we will include the case in comparison review if the two cases share a substantial characteristic, in addition to the common salient factor. For instance, if the proposed comparison case and the defendant's case both have the escape-detection aggravating factor in common, the cases' similarities would be sufficient for comparison. On the other hand, if the only additional factor shared by the cases is the victim's gender, the cases would not be sufficiently similar for comparison purposes.

For a proposed case that does not fall within the defendant's salient-factors-test classification, it will be included in defendant's comparison group only if the two cases share several defining characteristics. For example, two gas-station-robbery-murders in which the victim was shot once in the head despite offering no resistance should be compared to each other although one case is classified in salient factor B (prior murder conviction)

---

[6] Defendant's salient-factors-test classification is his salient-factors-test category or, if defendant's case falls within category D, E, or F, his subcategory. In this case, Morton's salient-factors-test classification is F–2.

and the other as F–2 (business-robbery-murder). In contrast, a residential-rape-murder by a prior murderer, which would be classified in salient-factor B, should not be compared to a carjacking-rape-murder in salient factor D (sexual assault) because of the cases' dissimilarities.

We believe that those standards for defining a defendant's comparison group best harmonize the goals of comparing defendant's case to similar cases, keeping the number of comparison cases manageable, and enabling frequency analysis and precedent-seeking review to complement each other. By placing a high, but not unattainable, bar to using a comparison case outside defendant's salient-factor classification, we are effectuating our willingness in *Proportionality Review I, supra,* 161 *N.J.* at 91, 735 *A.*2d 528, to compare some cases that cross salient-factor classifications while acknowledging the primacy of the classifications and the importance of having frequency analysis and precedent-seeking review correlate.

### a. COMPARISON OF SIMILAR CASES TO DEFENDANT'S CASE

First, we discuss the other defendants in the F–2 subcategory.

Unlike defendant, Carl Culley had a prior conviction for theft and criminal mischief. Also, Culley planned the robbery. Otherwise, defendant's culpability is greater than Culley's culpability. Although Culley, like defendant, ultimately killed the gas-station attendant in order to escape apprehension, Culley claimed that the first shot was fired accidentally when the attendant grabbed the barrel of the gun. Accordingly, defendant's murder evinces greater premeditation. In addition, Culley's murder victim suffered far less than Michael Eck. Further, unlike defendant, Culley, who was nineteen years old at the time of the murder, claimed to have been abused as a child. Therefore, Culley's life sentence does not support defendant's claim of disproportionality.

Richard Feaster also had a limited prior criminal record. His commission of a second robbery-murder at a gas station demonstrates a less favorable character than defendant's. Feaster,

unlike defendant, primarily planned the robbery-murder. Furthermore, Feaster is alleged to have said that he committed the murder to experience the thrill of killing. On the other hand, Feaster's execution-style killing involved substantially less victimization than defendant's brutal painful slaying of Eck. In addition, Feaster suffered brain damage and experienced an abusive childhood. He also was three years younger than defendant at the time of their respective gas-station robbery-murders. Feaster's death sentence is not persuasive evidence of the alleged disproportionality of defendant's death sentence.

With the exception of Tim Harris's enormous juvenile record and unemployability, features of Harris's murder show defendant to be more culpable than he. Harris killed Audrey Williamson to complete the robbery, not to escape apprehension for it. Williamson suffered much less than Eck, and Harris was only nineteen years old. These factors explain why Harris received a life sentence, and not the death penalty and undermine any comparison implicating disproportionality in defendant's sentence.

Although he planned the robbery-murder by himself, Craig Hart was not as deathworthy as defendant. Like defendant, Hart had no prior record but committed a second robbery in which the victim did not die. Hart's execution-style killing instilled tremendous fear in the victim; however, Eck was similarly fearful and suffered much greater physical pain than the taxi driver Hart killed. Hart was not motivated by a desire to eliminate a witness. Also, a jury concluded that Hart was intoxicated at the time of the murder.

Defendant is more deathworthy than Jacinto Hightower, who two juries sentenced to die. Hightower planned his robbery-murder alone. He shot Cynthia Barlieb, a convenience store clerk, three times, including once execution-style in the head. However, Barlieb suffered less than Eck. Like defendant, Hightower was gainfully employed and committed the murder to escape apprehension for the robbery. Unlike defendant, Hightower grew up in an abusive environment and suffered several

personality disorders.[7]   Finally, Hightower was only twenty-one years old when he murdered Barlieb.

Roger Hoyte was sentenced to life imprisonment for the execution-style murder of three cab drivers.   Although his murders were heinous, Hoyte had a clean record and was three years younger than defendant.   Further, Hoyte was substantially cooperative with police and inculpated his co-defendants and another man in an unsolved murder of a cab driver.   He also expressed sincere remorse for his crimes.   Hoyte was a drug addict who killed to effectuate the robbery, rather than to escape detection for the robberies.   Therefore, Hoyte's life sentences do not strongly support defendant's disproportionality claim.   Furthermore, "[t]he fact that other defendants in comparable cases have been spared is not dispositive." *Chew, supra,* 159 *N.J.* at 215, 731 *A.*2d 1070.

Anthony Inman was not as deathworthy as defendant, although Inman had prior convictions and was unemployed.   Inman apparently did not form an intent to kill until the victim pointed a gun at him.   When he committed the crime, Inman was twenty-one years old and intoxicated.   The prosecutorial decision not to seek a death sentence against Inman does not sustain defendant's claim of disproportionality.

David Russo shot three victims.   He killed one of them and inflicted severe brain damage on another victim.   On the other hand, Russo exhibited exemplary jailhouse behavior that may offset his considerable criminal record.   Russo abused alcohol, heroin, and cocaine and was intoxicated when he committed the crimes.   He also suffered from depression.   Indeed, the jury found the c(5)(a) (extreme emotional disturbance) and c(5)(d) (diminished capacity) mitigating factors.   Although Russo's crimes made him highly deathworthy standing alone, he had more miti-

---

[7] At trial, defense counsel for Morton presented no evidence of childhood abuse or adult mental illness.

gating factors than defendant. Therefore, Russo's life sentence does not lend support to defendant's disproportionality claim.

The degree of victimization in Abdel Jaber Saleh's murder, which he planned alone, was formidable. Saleh strangled Michael Rehani and smashed him over the head with a crowbar prior to setting Rehani on fire. Although Rehani was still alive, mercifully, he lost consciousness before he began burning. Thus, despite the brutality of this murder, Rehani probably suffered less agonizing pain than Eck. Like defendant, Saleh was steadily employed and had no criminal record or any psychiatric or substance abuse problems. Saleh was three years younger than defendant. The jury found as a mitigating factor that Saleh's family, which included his wife and 2 year-old daughter, would suffer emotional and psychological harm if Saleh was executed. That finding helps to explain why Saleh's life was spared. On the whole, Saleh's life sentence does not support defendant's claim that his death sentence is disproportionate.

There were several similarities between Frederick Simmons and defendant. Both men had borderline intellectual functioning, lacked serious criminal records, were assisted by co-defendants who planned the robberies, stabbed their homicide victims, seriously injured another person, initially proclaimed their innocence, and ultimately confessed to committing their murders to eliminate a witness. However, there were substantial differences between the two men as well. Simmons imbibed beer and used cocaine prior to committing the crimes. Simmons also suffered from depression and numerous personality disorders. The jury found that Simmons was extremely emotionally disturbed when he committed the murder. Consequently, Simmons was not as deathworthy as defendant.

Rafael Slaughter's life sentence also lends little support to defendant's claim that his sentence is disproportionate. Like Morton, Slaughter was not emotionally disturbed but received inadequate parenting during his childhood. Because Slaughter's victim remained conscious for only twelve minutes after being shot

twice in the back, it appears that the victim did not suffer as much as Eck, who lingered and was not pronounced dead until nearly two hours after the stabbing. Although Slaughter caused two other restaurant employees to fear that he would kill them also, he did not attempt to injure them. Slaughter was three years younger than defendant. Most importantly, Slaughter committed the murder to complete the robbery, not to escape apprehension. The jury found that Slaughter's age, 22, was a mitigating factor. The jury also found the catchall mitigating factor, and that the two mitigating factors were not outweighed by the single aggravating factor of felony murder. That explains why Slaughter's life was spared, and does not support Morton's claim of disproportionality.

Like defendant, Corey Washington killed one person who worked at a check-cashing business and, along with his co-defendant, used deadly force against, but did not kill, a second person. Washington clearly killed his victim to eliminate him as a witness and like Eck, Washington's victim begged for his life. However, only Eck suffered extreme, protracted physical pain. Washington had one prior conviction, which is one more than defendant had, and was only nineteen years old when he committed the robbery-murder. He pled guilty to murder, and was sentenced to thirty years with no parole eligibility. The mitigating factors found were age and the catchall factor. Although Washington may appear as deathworthy, defendant's death sentence when compared to Washington's life sentence does not demonstrate "some impermissible or invidious factor or pattern that has been broken." *Marshall II, supra,* 130 *N.J.* at 181, 613 *A.*2d 1059, *quoted in Chew II, supra,* 159 *N.J.* at 214, 731 *A.*2d 1070.

The degree of victimization in Ronald Wheeler's case rivaled the victimization in defendant's murder. He stabbed his office manager thirteen times, causing her to suffer tremendous pain. However, Wheeler is not as deathworthy as defendant. Wheeler's murder and robbery were not premeditated. Wheeler sought a Christmas bonus to which he believed he was entitled, and killed the victim after she denied him the bonus. Additionally, Wheeler

did not kill the victim to escape apprehension for the underlying crimes.

Charles Williams committed crimes that were more aggravated and more mitigated than defendant's offenses. Trying to escape detection for robbing a McDonald's, Williams shot two people execution-style. He shot the manager and an employee in the head, killing the manager and permanently disabling the employee. He shot at but missed another employee, who escaped. Williams's lengthy criminal record further tarnished his character. Williams could not be less amenable to rehabilitation. On the other hand, there was substantial evidence that Williams's father physically and sexually abused him, and his mother neglected him. His evidence of abuse was particularly disturbing. Furthermore, Williams's slaying was less brutal than defendant's repeated stabbing of Eck. The jury found the felony-murder and escape-detection aggravating factors and 28 of the 50 catchall mitigating factors submitted by defendant. That is likely the reason he was spared the death penalty. His life sentence does not support defendant's disproportionality claim.

Donald Loftin's fatal shooting of Sophia Fetter at Harrah's Casino was not as deathworthy as defendant's murder. Like defendant, Loftin had no prior record and no mental illness, drug addictions, or abusive childhood. Unlike defendant, Loftin had normal intellectual functioning and committed a subsequent murder. However, defendant's murder of Eck involved a far higher degree of victimization than Loftin's murder of Fetter. Further, Loftin's noncapital prosecution for the Fetter murder may have been the product of prosecutorial strategy. Perhaps the Atlantic County and Mercer County Prosecutor's Offices collaborated and aimed to convict Loftin of the Fetter murder before trying Loftin capitally, at which point the State could prove the prior-murder aggravating factor in the subsequent capital trial for the murder of Gary Marsh. Irrespective of whether that possible strategy explained the noncapital prosecution of Loftin for murdering Fetter, the circumstances of Loftin's life sentence do not lend support to defendant's claim of disproportionality.

All of the previously discussed cases in the F-2 category involved brutal and vicious killings. When defendant's case is compared to those other death- and life-sentenced robbery-murder defendants, we are satisfied that defendant's sentence of death is not disproportionate. As we observed in the direct appeal, the infliction of twenty-four stab wounds, including several to the genital area, "supports the inference that defendant intended to inflict severe pain" in addition to the fatal wounds. *Morton I, supra,* 155 *N.J.* at 456, 715 *A.*2d 228. The high degree of brutality exhibited by the twenty-four stab wounds and by the fact that Eck was left to die surpasses the one or two gun shot wounds inflicted by Culley, Harris, Hoyte, Inman, Russo, Slaughter, Washington, Williams, and Loftin. *See Loftin II, supra,* 157 *N.J.* at 338, 724 *A.*2d 129.

### b. *PUBLIC DEFENDER'S PROPOSED COMPARISON CASES*

The Public Defender additionally seeks to have this Court compare defendant's circumstances to five cases within the F-2 subcategory and two cases within the B-1 subcategory that the Attorney General contends are not sufficiently similar to defendant's case. In the F-2 subcategory, those cases are Emanuel Charles, John Downie, Khalif James, Larry Jones, and Harold Rodriguez. In the B-1 subcategory, those cases are John Fautenberry and Frank Pennington.

The Court declines to include Emanuel Charles and Larry Jones in defendant's comparison group because the cases bear little resemblance to defendant's case except for the common salient factor that the murders were committed during the course of a business-robbery. We also do not include John Fautenberry and Frank Pennington in defendant's comparison group because these cases are in subcategory B-1 and do not share the "several defining characteristics," *supra* at 256, 757 *A.*2d at 196, with defendant's case that would warrant a comparison.

Fautenberry killed a truck driver he met at a truck stop. However, the murder was not committed during the course of a

robbery of the truck driver's business. The only relevant similarity between Fautenberry and Morton is that Fautenberry killed his victim because he did not like to leave witnesses. An important difference between the two defendants is that Fautenberry already had two prior murder convictions, one in Ohio for which he received the death penalty. There are not enough similarities to warrant a comparison to defendant's case.

Pennington's murder occurred during the robbery of a bar. There is no evidence of similarities, such as escape-detection or high victimization, to Morton's case. In fact, testimony reveals that Pennington may have been provoked by the victim, the owner of the bar, who threw a glass at Pennington. Because this case is in the prior-murder subcategory and does not share critical similarities with Morton's case, we do not include it in precedent-seeking review.

The three remaining cases, John Downie, Khalif James, and Harold Rodriguez, we include in defendant's comparison group.[8]

Like defendant, John Downie robbed and then killed a gas-station attendant in the early morning hours. Downie fired two shots at the victim, an eighteen-year old gas station attendant, but only the second bullet struck the victim. That bullet struck the victim in the chest, killing him. Presumably, he did not suffer as much as defendant's victim, Eck. In contrast to defendant, a jury concluded that Downie did not commit the murder to escape detection for the robbery. The jury also found that Downie was emotionally disturbed and suicidal, and his family was dysfunctional. Thus, the jury concluded that Downie had established the c(5)(a) (extreme emotional disturbance) and c(5)(d) (diminished capacity) mitigating factors. Although some aspects of Downie's crime were more aggravated than defendant's offense, such as the fact that Downie planned the robbery-murder himself, and, while fleeing from the scene, fired four shots at a police officer, the jury

---

[8] Extended summaries of these cases are provided in Appendix A.

found that the mitigating factors outweighed the single aggravating factor, felony murder, thus precluding the death penalty. The strong evidence of emotional disturbance and diminished capacity had a substantial impact in Downie's favor. Therefore, we conclude that the decision not to impose the death penalty on Downie does not suggest that defendant's sentence is disproportionate.

Khalif James also robbed and murdered a gas-station attendant, but he was sentenced to life in prison. The comparison of James's crimes to defendant's offenses also does not support defendant's claim of disproportionality. In some respects, James may have been more blameworthy than defendant. James may have played a more critical role in planning the gas-station robbery than defendant and James showed no remorse at all. The cases are similar in that both men had no prior criminal record and both were employed. However, in all other pertinent respects, defendant was more culpable than James. James did not shoot the attendant until after the attendant attacked one of James's co-defendants. That fact influenced the AOC not to code the c(4)(f) (escape detection) factor in James's case. Also, James was nineteen years old and drunk when he committed the robbery-murder. Therefore, James's life sentence does not support defendant's disproportionality claim.

Harold Rodriguez's gas-station murder-robbery also belongs in defendant's comparison group. Rodriguez shot and killed a customer, who apparently did not suffer prolonged physical pain and may not have feared for his life. However, Rodriguez also shot the gas-station owner six times. Although he survived, he was required to spend two and one-half weeks in a hospital. Rodriguez and a co-defendant shot another woman in the leg in an unrelated robbery. Other than a conviction for marijuana possession, Rodriguez had no prior record. He had AIDS and was addicted to cocaine and heroin and may have been high at the time of the crime. The AOC coded the c(5)(d) (diminished capacity) mitigating factor present. He was permitted to plead guilty to non-capital murder. Although Rodriguez and defendant could be

considered similarly culpable, Rodriguez's terminal illness and diminished-capacity mitigating factors explain why he was not capitally prosecuted. Therefore, Rodriguez's life sentence does not support defendant's argument that his death sentence is disproportionate.

### c. *CONCLUSION*

Our precedent-seeking review does not show that Morton's death sentence is disproportionate. We conclude that defendant was more deathworthy than the fifteen agreed-upon life-sentenced cases in defendant's comparison group. Although Hoyte, Russo, Saleh, Slaughter, Washington and Williams appear highly death-worthy, their cases presented various mitigating factors, absent in defendant's case, that support life sentences. On the other hand, defendant's murder of Eck is not significantly less culpable than Feaster's murder of Donaghy, for which Feaster received a death sentence. In addition, defendant is more culpable than Hightower, who was sentenced to death by two juries.

Even if differences in deathworthiness cannot explain why defendant, but not Roger Hoyte or Charles Williams, received a death sentence, we do not demand a complete lack of disparity in proportionality review. "Disparity alone does not demonstrate disproportionality." *Bey IV*, 137 *N.J.* at 386, 645 *A.*2d 685, *quoted in Chew II*, *supra*, 159 *N.J.* at 214, 731 *A.*2d 1070. "Proportionality review seeks only to assure that defendant's sentence is not an aberration. It is not intended to ensure that one killer's sentence is identical to all other similarly categorized killers." *Harvey III*, *supra*, 159 *N.J.* at 319, 731 *A.*2d 1121 (citation omitted); *accord Cooper II*, *supra*, 159 *N.J.* at 115, 731 *A.*2d 1000; *Bey IV*, *supra*, 137 *N.J.* at 352, 645 *A.*2d 685. Consequently, we do not find that defendant's death sentence is aberrational.

### III. *OTHER ARGUMENTS*

### A. *ALLEGED INTRACASE DISPROPORTIONALITY*

Defendant argues that his sentence is disproportionate in part because Alonzo Bryant, the alleged more culpable co-defendant,

received a life sentence for the murder of Michael Eck. Ten of the jurors who deliberated in defendant's case concluded that defendant would not have committed the offense but for Bryant. That may or may not suggest that defendant's jury concluded that Bryant was more culpable than defendant. Even if the jury thought that Bryant was more culpable than defendant, however, Bryant's life sentence is not probative evidence of disproportionality. The jury in Bryant's case could not agree on whether Bryant committed the murder by his own conduct, despite the trial court's belief that Bryant inflicted some of Eck's stab wounds. The jury's finding made Bryant ineligible for the death penalty. Irrespective of Bryant's role as the primary planner of the robbery-murder, Bryant's death-ineligibility has little bearing on defendant's death-worthiness. *Cf. DiFrisco III, supra,* 142 *N.J.* at 170, 662 *A.*2d 442 ("Simply because the co-defendant hirer might have gotten away does not mean that the defendant hit-man in custody should not be prosecuted and punished.").

## B. *ALLEGED SYSTEMIC DISPROPORTIONALITY*

Defendant contends that racial discrimination in the application of the Death Penalty Act subjected him to cruel and unusual punishment and violated his right to equal protection of the laws. Defendant has not, however, demonstrated the required "relentless" documentation of the risk of discrimination. *See Marshall II,* 130 *N.J.* at 213, 613 *A.*2d 1059 (stating that the Court will overturn a death sentence if the defendant, through "statistical evidence, 'relentlessly' documents the risk that [the death] sentence was influenced by racial considerations").

According to defendant, in Burlington County, the location of his crime and trial, prosecutors sought death sentences against five of seven (71%) death-eligible black defendants but only two of six (33%) death-eligible white defendants. The lone Latino defendant who committed capital murder was not prosecuted capitally. Jurors sentenced to death four of the five (80%) capitally-prosecuted African–Americans, but neither of the two (0%) capitally-

prosecuted white defendants. Thus, four of seven (57%) death-eligible black defendants, but none of six (0%) death-eligible white defendants, received death sentences.

Despite those disparities, the sample size of fourteen death-eligible defendants is far too small to permit meaningful inferences to be drawn from the data. Defendant does not contend that the county-wide racial disparities are statistically significant. "A finding is said to be statistically significant if chance, acting alone, probably would not have caused it." *Loftin II, supra*, 157 *N.J.* at 301 n. 11, 724 *A.*2d 129 (internal quotations omitted). Furthermore, the bivariate analysis[9] of death sentencing in Burlington County fails to account for factors other than race and, thus, does not control for differences in culpability.

Defendant also points out that statewide, prosecutors prosecute capitally nearly fifty percent of cases with white victims but less than thirty percent of nonwhite-victim cases. Because of the inherent limitations of a bivariate analysis, even those troubling statistics cannot demonstrate systemic racial discrimination in capital punishment.

Cognizant of the bivariate analyses' flaws, defendant contends that regression analyses[10] reveal a race-of-victim effect when controlling for other factors reflecting on deathworthiness. Indeed, results from some regression models show a statistically significant race-of-victim effect in the likelihood that a death-eligible case will be prosecuted capitally. For the reasons this Court explained in *Loftin II, supra*, 157 *N.J.* at 310–15, 724 *A.*2d 129, methodological flaws preclude reliance on the results of the multiple regressions defendant brings to this Court's attention.

---

[9] In a bivariate analysis, there is only one independent variable. In a test for the presence of racial discrimination, the lone independent variable is race.

[10] "Multiple-regression analysis is a statistical tool used to describe the relationship between one or more independent variables (e.g., prior murder) and a dependent variable (e.g., the death penalty)." *Loftin II, supra*, 157 *N.J.* at 295 n. 8, 724 *A.*2d 129.

Therefore, defendant cannot relentlessly document systemic racial discrimination in the death penalty.

Defendant maintains that at his trial the "prosecutor capitalized on the racially inflammatory features of this black-on-white murder." The trial record refutes defendant's contention. Carolyn Bennett, Bryant's girlfriend's roommate and a prosecution witness, testified that on the night of the murder defendant told her that there was "one less cracker [for him] to worry about." That statement by defendant was admissible because it corroborated his confession, which defendant denied making, and was probative of his identity as the perpetrator and his intent to kill Eck. Although at summation the prosecutor argued that defendant boasted about the murder to Bennett, the prosecutor never referred to defendant's utterance of the racial epithet. Therefore, defendant cannot demonstrate that racial discrimination contaminated his case.

In *Proportionality Review II*, also issued today, this Court reviewed proportionality data compiled and conclusions reached in *Baime Report II*. We accepted and agreed with Judge Baime's final determination that discrimination and racial bias have not been shown to influence application of our death penalty sentencing system. *Proportionality Review II, supra,* 165 *N.J.* at 225–26, 757 *A.*2d 168.

Judge Baime concluded that presently there is "no reliable statistical evidence" that the race of either the defendant or the victim influences whether the death penalty is imposed. *Baime Report II, supra,* at 66. The current statistical methodologies do not demonstrate that defendant's race plays a significant role in death sentencing "either at the penalty trial stage or in the larger death-eligible sample of cases," *ibid.,* or that a defendant's race affects which cases progress to the penalty phase. *Ibid.* Nor do the models demonstrate that the victim's race affects the likelihood of a defendant receiving a death sentence. We concurred in Judge Baime's conclusions, *Proportionality Review II, supra,* 165

*N.J.* at 225–26, 757 *A.*2d 168, and accordingly, we reject defendant's argument.

## IV. *CONCLUSION*

Defendant does not meet his burden of establishing that his death sentence is disproportionate. Nor has he met his burden of proving that racial bias operates as an impermissible factor in New Jersey's death sentencing system.

Accordingly, we affirm defendant's death sentence.

## *APPENDIX A*

### I. *BUSINESS–ROBBERY MURDERS: F–2 (AGREED UPON CASES)*

#### (1) *CARL CULLEY*

Armed with an automatic shotgun and wearing a ski mask and gloves, Culley drove into a gas station in the wee hours of the morning. He intended to rob the station, but he changed his mind after the lone attendant filled his tank. Culley told the attendant that he did not have money to pay for the gasoline, and the attendant responded that he would call the police unless Culley left his car at the gas station. Culley attempted to scare the attendant by pointing the gun at him. Culley claimed the attendant grabbed the barrel of the gun and was shot when the gun accidentally fired. Culley then got out of his car and shot the attendant in the back. The attendant died from the gunshots. In his confession, Culley admitted that he intended to kill the attendant with the second shot to prevent the attendant from identifying him.

At the time of the offense, Culley was nineteen years old. He was enrolled in college and had worked as a landscaper and maintenance man. He had a prior conviction for theft and criminal mischief. He claimed that he was sexually abused when he was a child.

Culley was prosecuted noncapitally. A jury convicted him of murder, felony murder, and weapons offenses. The judge sentenced him to thirty years imprisonment during which he would not be eligible for parole. According to the AOC's coding, the c(4)(f) (escape detection) and c(4)(g) (felony murder) aggravating factors and the c(5)(c)(age) and c(5)(h) (catch-all) mitigating factors were present in this case.

(2) *RICHARD FEASTER 1*

Armed with a sawed-off shotgun he had purchased two weeks earlier, Feaster and Michael Mills one evening drove to the Family Texaco in Deptford. Feaster placed the sawed-off shotgun against the face of Keith Donaghy, the only attendant working at the time. Feaster then fired the fatal shot, which literally blew out Donaghy's teeth and destroyed his brain. He subsequently stole $191.32 from Donaghy's pants pocket. No physical evidence linked Feaster to the crime; however, he made inculpatory statements to several people. Feaster told a jailhouse informant that he shot a man in the head at point-blank range in order to see what it felt like to kill before enlisting in the Marines.

Feaster was twenty-two years old and had a high-school diploma. He was unemployed but he had worked in construction jobs. He had suffered brain injuries that hindered his impulse control. He also had borderline intelligence. His alcoholic father abused him and his mother. Feaster had prior convictions for marijuana possession and simple assault. The same month he killed Donaghy, Feaster committed another robbery-murder at a different gas station in Deptford.

Despite the defense's vigorous attacks on the State's witnesses' credibility, the jury convicted Feaster of purposeful-or-knowing murder by his own conduct, felony murder, robbery, and weapons offenses. At the penalty phase, the jury found the c(4)(g) (felony murder) and c(5)(h) (catch-all) factors present and rejected the c(5)(c)(age) mitigating factor. The jury sentenced Feaster to death. The court sentenced him to a consecutive twenty-year

prison sentence with a ten-year parole disqualifier for the robbery conviction.

### (3) *TIM HARRIS*

Harris and co-defendant Laquam Lassiter followed Robert Lee Rose and Audrey Williamson into a store in Newark. Pointing a revolver at Rose's head, Harris demanded money. Rose handed Harris a ten-dollar bill, but Harris ordered him to relinquish additional cash. Rose gave Harris another $140. Harris then pointed his gun at Williamson and said: "Give it up, bitch." She gave him forty dollars but resisted his demands for more money. Frightened, Williamson began to run behind the store counter. Harris lethally shot her in the head. Lassiter took $230 from Williamson. Harris told Lassiter that he shot Williamson because she did not give him all of her money.

Harris, who turned nineteen the month he murdered Williamson, had no prior adult record but an extensive juvenile record. He had no psychiatric problems and claimed to have no history of substance abuse. He dropped out of high school after tenth grade and did not work afterward. Harris confessed to the murder, but repudiated the confession at trial.

The prosecutor tried Harris non-capitally. The jury convicted him of murder, robbery, aggravated assault, conspiracy to commit robbery, and weapons offenses. The court sentenced him to an aggregate prison term of life imprisonment plus twenty years with a forty-year parole disqualifier. The AOC coded as present the c(4)(g) (felony murder) aggravating factor and the c(5)(c)(age), c(5)(f) (no prior record), and c(5)(h) (catch-all) mitigating factors.

### (4) *CRAIG HART*

Craig Hart, who was twenty-five years old, got into a taxicab at 5:30 in the morning. He told the driver that he was going to rob him and ordered the driver to lie face-down in the front seat of the taxi. Hart shot the driver twice in the back of the head. After firing the fatal gunshots, Hart stole the driver's cash, credit card, wallet, and watch. Four weeks later, Hart confessed to the

robbery-murder after he was arrested for committing another robbery.

Hart was an unemployed high-school graduate who had worked as a mailroom clerk and cabinet maker. He had no prior criminal history. He abused cocaine and marijuana but appeared to have no psychological problems.

Although Hart pled guilty to purposeful-or-knowing murder and armed robbery, the State prosecuted him capitally. The jury, believing that Hart was intoxicated when he committed the robbery-murder, found the c(4)(g) (felony murder) aggravating factor and the c(5)(a) (extreme emotional disturbance), c(5)(c)(age), c(5)(d) (diminished capacity), c(5)(f) (no prior record), and c(5)(h) (catch-all) mitigating factors. The court sentenced Hart to life imprisonment for the murder and a consecutive twenty-year prison term for the robbery. Hart's aggregate parole ineligibility equaled forty years.

(5) *JACINTO HIGHTOWER 1A & 1B*

In the early afternoon, Hightower walked into the Cumberland Farms convenience store in Willingboro. Hightower put Pampers on the store counter and asked Cynthia Barlieb, the store clerk, for a carton of cigarettes. While she was retrieving the cigarettes, Hightower changed the sign on the store's front door from "open" to "closed." He returned to the counter, pulled out a gun, and ordered Barlieb to open the cash register. She declined, and he shot her in the chest. She continued to refuse to open the register, and he shot her in the neck. Hightower tried to open the register himself and became frustrated by his inability to do so. When he felt Barlieb grab his leg, he shot her in the head. Hightower dragged her lifeless body into the freezer, turned off the lights, and left the store.

When he committed the murder, Hightower was twenty-one years old and on leave from the United States Army. Disciplinary problems induced him to drop out of high school in tenth grade, but he later earned a GED. Various psychiatric experts had

diagnosed him with dysthymic disorder (depressive neurosis), episodic drug and alcohol abuse, borderline personality disorder, narcissistic personality disorder, and antisocial personality disorder. A brain defect caused the antisocial personality disorder. His mother had mild affective disorder, experienced mood swings, and had difficulty with impulse control. When Hightower was young, other boys sodomized him; nonetheless, his mother did not seek medical attention for him. Hightower's mother was often absent for long periods of time, frequently immersed in extramarital affairs, and told her children that she hated them because they deprived her of freedom. He was raised in an abusive and dysfunctional environment.

A jury convicted Hightower of murder, felony murder, armed robbery, and weapons offenses. He asked to be sentenced to death, and the jury obliged. The jury found the c(4)(c) (torture or depravity), c(4)(f) (escape detection), and c(4)(g) (felony murder) aggravating factors and the c(5)(f) (no prior record) and c(5)(h) (catch-all) mitigating factors. This Court affirmed the convictions but reversed the death sentence because the trial court erroneously instructed the jury that unanimity was required for mitigating factors. *State v. Hightower*, 120 *N.J.* 378, 577 *A.2d* 99 (1990). The State retried Hightower, and the second jury also sentenced him to death. The jury found the c(4)(f) (escape detection) and c(4)(g) (felony murder) aggravating factors and the c(5)(c)(age), c(5)(f) (no prior record), and c(5)(h) (catch-all) mitigating factors. Because the trial court improperly removed a juror during deliberations, this Court again reversed Hightower's death sentence. *State v. Hightower*, 146 *N.J.* 239, 680 *A.2d* 649 (1996). The State has not yet retried him.

(6) *ROGER HOYTE 1, 2 & 3*

In a period of two and one-half weeks, Hoyte murdered three taxicab drivers in the Newark area. For the first two killings, he and co-defendants Andres Torres and Larry Mayo called for a taxicab. When the taxi arrived, Hoyte got into the back seat of

the cab and mortally shot the driver in the head. They drove the cab, took each driver's money (and the second victim's watch), removed his shoes, and discarded his body. These killings occurred three days apart. Only Hoyte and Torres participated in the third murder, which they committed nearly two weeks after the second homicide. The driver survived the gunshot wound Hoyte had inflicted in the back of his head, but Hoyte shot him twice more and stabbed him in the neck. Torres drove the taxi, and they took the victim's money and shoes before dumping his dead body in a garbage can. They removed each victim's shoes so the police could not trace the fingerprints they had left on the shoes to them.

Hoyte used the same .22–caliber handgun in all three homicides. They stole the gun during a burglary of Premier Aluminum Company, Hoyte's former employer, one month before the murders. Two days after the last killing, Hoyte sold the gun for fifty dollars.

Mayo's girlfriend implicated Hoyte and Torres in the well-publicized taxicab-driver murders. After being arrested, Hoyte confessed and told the police officers of his and his co-defendants' involvement in the crimes. Hoyte also inculpated Mayo and two other men in an unsolved taxicab-driver murder that had occurred two years earlier.

Hoyte was a twenty-two-year-old, unemployed high-school graduate who used heroin, cocaine, and marijuana every day for the three years preceding the murders. He had a prior arrest for unlawful possession of a weapon that was dismissed pursuant to his participation in pre-trial intervention.

Hoyte pleaded guilty to three counts each of capital murder, felony murder, robbery, carjacking, unlawful possession of a weapon, possession of a weapon for an unlawful purpose, and conspiracy to commit robbery. He also pleaded guilty to one count each of burglary and theft. At the penalty phase, for each victim the jury found that the State had proven the c(4)(g) (felony murder) but

rejected the c(4)(f) (escape detection) aggravating factor. The jury found the presence of the c(5)(c)(age), c(5)(f) (no prior record), c(5)(g) (assistance to the State), and c(5)(h) (catch-all) mitigating factors for each victim. With respect to each murder, the jury could not unanimously agree on the proper sentence. The court sentenced Hoyte to three consecutive life sentences and a ninety-year aggregate parole-ineligibility period.

## (7) ANTHONY INMAN

Inman, who was twenty-two years old, and his co-defendant Wayne Harvey were looking to rob drug dealers when they discovered an apparently less dangerous target. They saw a grocery store open and decided to rob it. They went inside after a customer left the store. Inman pulled out a .45–caliber handgun and ordered that the victim, a co-owner of the store, give money to Harvey, who was aiming his nine-millimeter handgun at the victim. The victim reached for his gun, and Inman shot him twice in the chest. The victim yelled to the other co-owner: "They're killing me! Run!" The co-owner did not take the victim's advice. He ran into the front of the store and shot Inman twice. Inman and Harvey fled.

Inman was under the influence of drugs and alcohol when he committed the robbery and homicide. Except for being a heroin addict, Inman had no physical or psychological problems. He was unemployed. He had prior convictions for theft as well as drug and weapons offenses.

Inman pleaded guilty to aggravated manslaughter, conspiracy, robbery, and weapons offenses. The court sentenced him to thirty years imprisonment with a fifteen-year parole bar for the aggravated manslaughter conviction and a consecutive ten-year prison term and a five-year parole disqualifier for the robbery conviction. His aggregate sentence was forty years imprisonment, twenty years of which he would be ineligible for parole.

The AOC coded as present the c(4)(g) (felony murder), c(5)(d) (diminished capacity), and c(5)(h) (catch-all) factors.

(8) *DAVID RUSSO*

After his car broke down on the New Jersey Turnpike, Russo went to a gas station in Swedesboro. He returned a week or two later. Both times he went to the gas station, he was friendly and engaged the gas-station attendants and auto mechanics in conversation. Thus, they were surprised when Russo suddenly brandished a nine-millimeter handgun and announced a stick-up the evening of his second visit to the station. He ordered Joseph Iovanisci, Dino Rossi, and Ann Kiley to walk from the office to the parts room, where he made them lie on the floor. Then, Russo shot all of them from point-blank range. Iovanisci died from a gunshot wound to the head, and Kiley was seriously brain damaged. Russo did not seriously injure Rossi despite shooting him twice.

Russo confessed after police officers apprehended him. He was intoxicated when he committed the crime and had a history of heroin and cocaine addiction and alcoholism. He also has suffered from depression. He enlisted in the Air Force while in eleventh grade and remained in the Air Force until his apprehension. Russo, who was twenty-nine years old, had a GED. His prior record consisted of a weapons offense and getting court martialed for a drug offense. After his arrest, Russo behaved exemplarily in jail.

A jury convicted Russo of capital murder, felony murder, two counts of attempted murder, four counts of aggravated assault, armed robbery, and possession of a weapon for an unlawful purpose. At the ensuing penalty phase, the jury found present the c(4)(b) (grave risk of death to others) and c(4)(g) (felony murder) aggravating factors but rejected the c(4)(f) (escape detection) aggravating factor. The jury found the c(5)(a) (extreme emotional disturbance), c(5)(c)(age), c(5)(d) (diminished capacity), c(5)(f) (no prior record), and c(5)(h) (catch-all) mitigating factor. The jury unanimously concluded that the aggravating factors failed to outweigh the mitigating factors. The court sentenced

Russo to an aggregate term of life imprisonment plus forty years with a fifty-year parole disqualifier.

## (9) *ABDEL JABER SALEH*

Saleh agreed to buy 5000 videocassettes for $7500 from Michael Rehani. Saleh drove a rented U–Haul to Rehani's place of business in Hackensack. Saleh strangled Rehani and hit him over the head with a crowbar. Saleh dragged Rehani, who was unconscious, into his own office, bound and gagged him, doused him with charcoal fluid, and set him afire. Rehani was still alive when Saleh began burning him. While the fire burned, Saleh loaded the U–Haul with the 5000 videocassettes he was supposed to have purchased. Saleh drove to Old Bridge, where he placed the 5000 tapes in a storage area he had rented in his wife's name. Rehani's friends found Rehani burning. They put out the fire, but Rehani had died by the time firefighters arrived at the scene. The medical examiner concluded that the strangulation, head blows, and burns were each capable of causing death by themselves.

Saleh drove to Youngstown, Ohio, where he caught a flight to Los Angeles. One week after committing the murder, Saleh walked into a police station in Los Angeles. Saleh said that he had witnessed 2 Latino men commit the murder and the men forced Saleh at gunpoint to drive away. The subsequent investigation revealed that Saleh was the perpetrator.

Saleh was twenty-two years old. He was married and had a two-year-old daughter. He worked as a machine operator for his father-in-law's company. He had no mental health or substance abuse problems. He had no prior criminal record.

A jury convicted Saleh of capital murder, felony murder, aggravated arson, and robbery. The jury could not agree on whether to sentence Saleh to death. The jury found the c(4)(f) (escape detection), c(4)(g) (felony murder), c(5)(f) (no prior record), and c(5)(h) (catch-all) factors and rejected the c(4)(c) (torture or depravity) and c(5)(c)(age) factors. The court sentenced Saleh to life imprisonment plus thirty years with a forty-five year parole bar.

## (10) *FREDERICK SIMMONS*

At approximately 2:10 a.m., Simmons and co-defendant John Poteat walked into the Firehouse Tavern, a bar in Wildwood, and intended to rob it. When Poteat ordered a case of beer, the bartender, Michael James, thought something was strange and tried to flee. Poteat struck James over the head with a club. James implored Poteat to take money and leave him alone, but Poteat threatened to kill James. Poteat continued beating him, and James attempted to defend himself.

Robert Conners, the only customer in the bar, attempted to intervene in the altercation. Simmons interceded before Conners could help James. Simmons grabbed Conners and threw him into a wall and then into the bathroom, where Simmons slammed Conners's head into the sink. The blow broke the sink in half and knocked it of its mooring. Simmons then threw Conners into the ground, stomped on his neck, stabbed him five times, and stomped on his head. As Conners was dying from the stab wounds, Simmons rinsed off his knife with hot water and a paper towel. Simmons left the hot water running and left the bathroom. Simmons, careful not to leave fingerprints, went outside where Poteat and James were fighting. Simmons kicked James in the head while Poteat beat him. Simmons and Poteat subsequently fled. Simmons discarded the knife as he ran away from the Firehouse Tavern. James survived but had a fractured skull and other injuries.

After his arrest, Simmons initially proclaimed his innocence but ultimately confessed. Simmons admitted that he killed Conners because Conners could identify him.

Simmons was a thirty-five-year-old homeless and unemployed widower. He had previously worked as a short-order cook. He had a prior shoplifting conviction. He was an alcoholic and cocaine addict and had ingested large quantities of beer and cocaine prior to committing the crimes. Simmons functioned at an intellectual level slightly above mental retardation. He suffered

from depression and several personality disorders. Poteat had approached him with the suggestion that they commit robberies.

A jury convicted Simmons of capital murder, felony murder, conspiracy to commit robbery, robbery, attempted murder, aggravated assault, hindering apprehension, and weapons offenses. The jury could not agree on the appropriate sentence. The jury found the c(4)(f) (escape detection) and c(4)(g) (felony murder) aggravating factors and the c(5)(a) (extreme emotional disturbance), c(5)(c)(age), and c(5)(h) (catch-all) mitigating factors. The jury rejected the c(5)(d) (diminished capacity) mitigating factor. The court sentenced Simmons to life imprisonment plus forty-four years with a thirty-eight year parole disqualifier.

## (11) *RAFAEL SLAUGHTER*

One night at 11 p.m., Slaughter, who was twenty-two years old, went into a fast-food restaurant. He walked up to the counter, but before he ordered food he went to each side of the restaurant and looked out the window. An employee found this behavior suspicious. Slaughter left the restaurant after ordering his food. He returned three hours later, when the restaurant employees were preparing to close for the evening. Slaughter approached an eighteen-year-old male employee, who was taking out the trash behind the restaurant. Slaughter put a gun to his back and ordered him to walk inside the restaurant. Slaughter asked him for the combination to the safe, but the employee told Slaughter that he did not know the combination. Slaughter then shot him twice in the back from point-blank range. The victim bled profusely, lost consciousness twelve minutes after the shooting, and died shortly thereafter. Slaughter had also ordered two female employees to the ground, but he did not shoot them. After the shooting, Slaughter left the restaurant without any money.

Slaughter's parents were young and not ready for marriage when he was born. They did not have enough time for him, and they gave his brother preferential treatment. He did not have any substance abuse or emotional problems. He was helpful to

his relatives when they needed a hand with chores, babysitting, or other matters.

In connection with the murder, a jury convicted Slaughter of capital murder, felony murder, and weapons offenses. In the penalty phase, the jury found the c(4)(g) (felony murder), c(5)(c)(age), and c(5)(h) (catch-all) factors present and decided not to sentence Slaughter to death. On the murder conviction, the court sentenced him to thirty years imprisonment during which he would be ineligible for parole. The court also sentenced him to two consecutive ten-year prison terms for two auto thefts Slaughter committed the day of the murder.

(12) *COREY WASHINGTON*

Washington, John Bultran, and Jerome White planned to rob a check-cashing establishment. Washington had previously sold drugs to the clerk working at the store. Bultran also knew the clerk, who was twenty-five years old, and surmised that the perpetrators would have no problem getting behind the counter. When they approached the store, they observed that the front door was locked. Instead of knocking on the door or ringing a doorbell, Bultran and White fired gunshots into the floor. Their tactic worked, and the clerk opened the door. The three perpetrators made the clerk open the safe. They ordered him and his sixty-eight-year-old co-worker to lie on the floor while they removed the cash. Before they left, Washington shot the younger clerk in the head, and Bultran shot the older clerk in the head. The younger clerk died, but the older clerk survived.

Washington was nineteen years old. He dropped out of high school and had some experience working as a laborer. He had no history of substance abuse or mental illness. He had a prior conviction for assault and weapons offenses.

Washington averted a death sentence by pleading guilty to purposeful-or-knowing murder. The court sentenced him to thirty years imprisonment with no parole eligibility. The AOC coded as

present the c(4)(f) (escape detection), c(4)(g) (felony murder), c(5)(c)(age), and c(5)(h) (catch-all) factors.

(13) *RONALD WHEALER*

On December 16, 1983, Wheeler went to work seeking his Christmas bonus from his employer's daughter, who was the office manager. When she refused, he grabbed her pocketbook. An altercation ensued, and the office manager suffered several bruises. Wheeler then got a knife and stabbed her thirteen times. Wheeler inflicted stab wounds to her chest, neck, abdomen, back, and legs. The victim also had defensive wounds on her hands. Wheeler stole her pocketbook, her pay, and the company's petty cash. The victim suffered physical pain before dying.

Wheeler was a twenty-three year old high-school dropout who worked as a plumber's helper. A childhood injury caused him to have a permanent large bump on his head. He had no mental illness or drug addiction. He had no prior convictions and one arrest for marijuana possession that was subsequently dismissed.

Wheeler pleaded guilty to felony murder, and the court sentenced him to forty years imprisonment with a thirty-year parole bar. The AOC coded as present the c(4)(c) (torture or depravity) and c(4)(g) (felony murder) aggravating factors and the c(5)(f) (no prior record) and c(5)(h) (catch-all) mitigating factors.

(14) *CHARLES WILLIAMS*

After eating a meal at McDonald's, Williams walked up to the counter and pulled out a .38 caliber handgun. Williams demanded money from the restaurant manager and ordered two other employees to lie down on top of each other. Williams accompanied the manager as he emptied out the cash registers in the front counter and drive-through area. Williams then ordered the three employees into the back of the restaurant. He ordered the manager to remove money from the safe and the other employees to lie face down. He then made the manager lie down next to them. Williams shot the manager and one other employee in the head. The third employee escaped from the store although

Williams fired shots at him as he ran away. The manager died. The other employee whom Williams shot survived but sustained severe brain damage that permanently disabled him.

Williams was twenty-eight years old when he committed the offenses. With several prior convictions for robbery, burglary, theft, assault, and resisting arrest, Williams has spent all but ninety-three days of his adult life imprisoned. School authorities placed him in a Special Service School because he was classified as emotionally disturbed. He abused cocaine, marijuana, and alcohol, but he never received substance abuse treatment. When he was a child, Williams's parents, who were both drug addicts and alcoholics, abused and neglected him. From the time Williams turned ten years old, his father would order him drinks at neighborhood bars. His father, who was described as a womanizer and a pimp, forced Williams and his father's paramour to engage in various sex acts. Williams's father sexually abused Williams's sister and once sexually abused Williams. His father also was violently abusive toward Williams's mother, who had numerous black eyes, once had fractured ribs, and once needed treatment at a hospital. Williams's father broke Williams's ribs when Williams was nine because he had accidentally spilled his father's cocaine. Williams's mother was a prostitute and often left her children home alone while cavorting with other men. During these periods of abandonment, Williams would provide food for himself and his siblings by stealing from a local supermarket. Williams's mother suffered several emotional breakdowns, and she often called her children "little fuckers."

A jury convicted Williams of capital murder, felony murder, two counts of attempted murder, three counts of robbery, two counts of aggravated assault, and four counts of weapons offenses. The jury could not agree on the appropriate penalty. The jury found the c(4)(f) (escape detection) and c(4)(g) (felony murder) aggravating factors but rejected the c(4)(b) (grave risk of death to others) aggravating factor. The jury also found the c(5)(h) (catch-all) mitigating factor. The court imposed an aggregate sentence of

life imprisonment plus ninety-five years with a seventy-eight-and-
one-half year parole disqualifier.

## II. *OTHER–ROBBERY MURDER:*
### *F–3 (AGREED UPON CASE)*

### (1) *DONALD LOFTIN 1*

Approximately five weeks before he committed a robbery-mur-
der at the Exxon on Business Route 1 in Lawrenceville, Loftin
fatally shot Sophia Fetter, a sixty-nine-year-old chambermaid, in
the head while she was cleaning Room 1134 of Harrah's Casino
Hotel in Atlantic City. He had fired another shot that missed
Fetter. Loftin stole Fetter's keys that opened the guest bed-
rooms and maintenance closets.

Loftin, who was twenty-seven years old, had no prior record.
He had worked in a warehouse and as an armored car driver, and
he was a full-time college student when he committed the offenses.
Aside from teenage marijuana use, Loftin had no substance abuse
problems. A defense expert in the gas-station robbery-murder
case concluded that Loftin had borderline personality disorder,
but a prosecution expert disagreed with that conclusion. When
Loftin was five, his father abandoned the family. One year later,
Loftin set his mattress afire and caused his family home to burn
down. Loftin never received counseling for these traumatic
events.

The Atlantic County Prosecutor proceeded noncapitally. A jury
convicted Loftin of purposeful-or-knowing murder, felony murder,
robbery, burglary, and weapons offenses. The court sentenced
him to an aggregate term of life imprisonment plus fifteen years
with a thirty-five-year parole disqualifier. The AOC coded as
present the c(4)(f) (escape detection) and c(4)(g) (felony murder)
aggravating factors and the c(5)(a) (extreme emotional distur-

bance), c(5)(c)(age), c(5)(f) (no prior record), and c(5)(h) (catch-all) mitigating factors.[11]

### III. BUSINESS–ROBBERY MURDERS: F–2 (SELECTED CASES)

#### (1) JOHN DOWNIE

At 3:35 a.m. on Christmas morning, Downie robbed a gas station. He fired two shots at the gas-station attendant. The first shot missed, but the second shot hit the attendant in the chest and killed him. As Downie ran from the gas station, a police officer observed him. Downie shot at the officer four times, but none landed. Possessing cash he stole from the gas station, Downie hid in the woods.

The AOC narrative describes Downie as "an avidly religious, emotionally disturbed male whose family is dysfunctional and chaotic." Downie's mother suffered from depression. His father fathered a child in an extramarital affair and was rarely home. A psychologist described Downie's family as schizophrenic. When a schoolchild, Downie's peers ridiculed him and called him "Fatty." Because he was disruptive in school, school authorities referred him to a Child Study team. When Downie was seventeen or eighteen years old, his parents moved to Florida, and they refused to let him move with them despite his desire to do so. As a result, Downie lived in a household where he was beaten and abused, and where drugs and alcohol were consumed at parties. Downie had suffered a head trauma that may have caused organic personality syndrome. He was twenty-four years old when he committed the robbery-murder, but he was much less mature than most people his age. He was unmarried and never had a steady girlfriend. He was a high-school graduate who worked odd jobs. He has no

---

[11] The AOC coded present the three mitigating factors that the jury found in the Marsh murder plus the c(5)(f) factor, which was clearly present for the Fetter murder but not the Marsh murder.

prior criminal record. On the night of the crime, he had intended to commit suicide to get even with his family. He changed his mind though and decided to commit a robbery instead. Downie confessed his crime to a probation officer in between the trial and noncapital sentencing.

Although his attorney claimed that Downie's brother, who died from a drug overdose three months after the murder, committed the crimes, a jury convicted Downie of capital murder, felony murder, attempted murder, robbery, and possession of a weapon for an unlawful purpose. At the ensuing penalty phase, a jury found the c(4)(g) (felony murder) but rejected the c(4)(f) (escape detection) aggravating factor. The jury found the c(5)(a) (extreme emotional disturbance), c(5)(c)(age), c(5)(d) (diminished capacity), c(5)(f) (no prior record), and c(5)(h) (catch-all) mitigating factors. The jury determined that Downie should not be sentenced to death. The court imposed an aggregate sentence of life imprisonment plus eighteen years with a thirty-six-year parole disqualifier.

(2) *KHALIF JAMES*

James and co-defendants Lawrence McGriff and Jason Means were intoxicated and driving around when James and McGriff decided to rob a gas station. After getting out of the car, James asked McGriff if he wanted to go through with the robbery. McGriff answered affirmatively and they walked to the station. James pistol whipped the gas-station attendant. A guard dog bit McGriff, and James drew his gun purportedly to shoot the dog. Then, the attendant attacked McGriff, and James and McGriff shot the attendant, who died from four gunshot wounds, including one to his head.

James was a nineteen-year-old high-school graduate who had worked at a fast-food restaurant. He occasionally used alcohol or marijuana. He had no prior adult convictions. James confessed to shooting the gas-station attendant; however, he claimed that he had tried to shoot the attendant in the leg and had thought he shot him in the back.

The State did not prosecute James capitally. A jury convicted him of purposeful-or-knowing murder, felony murder, robbery, and weapons offenses. The court sentenced him to an aggregate term of life imprisonment with thirty years of parole ineligibility. The AOC coded as present the c(4)(g) (felony murder), c(5)(c)(age), c(5)(d) (diminished capacity), c(5)(f) (no prior record), and c(5)(h) (catch-all) factors.

(3) *HAROLD RODRIGUEZ*

Rodriguez and co-defendant Marceliano Guetierrez attempted to rob a gas station. Rodriguez shot and killed a customer. He also shot the gas-station owner six times. The owner survived but was hospitalized for two and one-half weeks. Rodriguez and Guetierrez's involvement in another robbery, in which they shot a woman in the leg, led to their apprehension for the murder.

Rodriguez was a thirty-seven-year-old father of three children. He was an illegitimate child who had been raised by his father. When Rodriguez was fourteen years old, he ran away from home. He was unemployed when he committed the murder, but he had previously worked as a machine operator. He used heroin and cocaine daily for twenty years and had a prior conviction for marijuana possession. There is no indication that he had emotional problems in addition to substance abuse. However, he had AIDS.

Rodriguez pleaded guilty to conspiracy to commit murder, murder, attempted murder, robbery (two counts), and weapons offenses. The court sentenced him to an aggregate term of life imprisonment with a thirty-year parole disqualifier. The AOC coded as present the c(4)(b) (grave risk of death to others), c(4)(g) (felony murder), c(5)(d) (diminished capacity), and c(5)(h) (catch-all) factors.

LONG, J., dissenting.

Robert Morton, a 25 year old man with no prior criminal record, emotional problems and an extremely limited intellectual capacity, was befriended by a sophisticated career criminal named Alonzo

Bryant. In Bryant's thrall, Morton agreed to participate in a gas station robbery in which Michael Eck was stabbed to death. The jury, nearly unanimously, concluded that but for Bryant, Morton would never have been involved in the crime. Despite that, Morton was sentenced to death and Bryant to life. Because of my abiding belief that the sentence imposed on Morton was not only disproportionate to that of Bryant, the mastermind of the crime, but also to the sentences imposed on other defendants with similar characteristics who committed factually similar murders, I dissent.

## I.

In *State v. Feaster*, decided today, I expressed my general reservations about our system of proportionality review. 165 *N.J.* 388, 443, 757 *A.*2d 266 (2000) (Long, J., dissenting). Rather than repeat those points, I incorporate them here and add an additional concern about the Court's handling of the problem of intra-case disproportionality.

The Court holds that this case presents no such disproportionality although Bryant, the career criminal who devised the robbery-murder, was sentenced to life and Morton, a follower with no prior criminal involvement, was sentenced to die. Ten jurors in Morton's case determined that he would not have committed, or participated in, the murder but for Bryant's lead. The jury apparently concluded that Bryant was more culpable than Morton.

However, Bryant's jury was deadlocked regarding whether he committed the murder by his own conduct; accordingly, he was not death-eligible. Despite that ineligibility, the court that presided over both trials specifically concluded that Bryant had indeed stabbed the victim. In my view, Bryant's life sentence renders Morton's death sentence disproportionate. "Where a more culpable co-defendant receives a life sentence, a sentence of death should not be imposed on the less culpable defendant." *Ray v. State*, 755 *So.*2d 604, 611 (Fla.2000) (reversing death sentence because more culpable co-defendant received life sentence); *accord Hazen v. State*, 700 *So.*2d 1207, 1214 (Fla.1997) (same); *see*

*also State v. Windsor,* 110 *Idaho* 410, 716 *P.*2d 1182, 1193 (1985) (holding less culpable co-defendant's death sentence disproportionate even though more culpable co-defendant also received death sentence); *State v. DiFrisco,* 142 *N.J.* 148, 250–52, 662 *A.*2d 442 (1995) (*DiFrisco III* ) (O'Hern, J., dissenting) (arguing death sentence disproportionate because State did not prosecute co-defendant).

Upholding Morton's death sentence in the face of Bryant's life sentence violates our principle that we "treat like cases alike." *State v. Marshall,* 130 *N.J.* 109, 220, 613 *A.*2d 1059 (1992) (*Marshall II* ) (citing H.L.A. Hart, *The Concept of Law* 155 (1961)). Indeed, sentencing Morton to death while sentencing Bryant, the substantially more culpable co-defendant, to life in prison is arbitrary and cannot be upheld. *See Gregg v. Georgia,* 428 *U.S.* 153, 189, 96 *S.Ct.* 2909, 2932, 49 *L.Ed.*2d 859, 883 (1976) (noting death penalty cannot be imposed arbitrarily); *State v. Ramseur,* 106 *N.J.* 123, 190, 524 *A.*2d 188 (1987) (holding New Jersey Constitution provides heightened protection from arbitrariness and inconsistency in capital sentencing). Unless justified by substantial differences in mitigating evidence, which is not the case here, if a co-defendant who instigated and planned a murder receives a life sentence, the defendant who followed the co-defendant's lead cannot be sentenced to death consonant with the notion of proportionality. The Court has omitted consideration of those very basic principles in rejecting Morton's intra-case disproportionality claim.

II.

A. *Salient Factors*

Robert Morton's own case is included in the salient factor statistics. For the reasons discussed in *Feaster, supra,* 165 *N.J.* at 458, 757 *A.*2d 266 (Long, J., dissenting), Morton's death sentence should not confirm its own propriety. *Marshall II, supra,* 130 *N.J.* at 263, 613 *A.*2d 1059 (Handler, J., dissenting). Equally troubling is the fact that one of the death sentenced F–2 cases included in Morton's category is that of Richard Feaster whose

case the Court decided today. It is incomprehensible to me that the Court can use Feaster's sentence to justify Morton's and Morton's to justify Feaster's.

Excluding Morton's own case under the salient-factors test, thirteen percent of death-eligible cases in the F–2 category resulted in the death penalty, compared to eleven percent overall. Excluding both Feaster and Morton, as I believe we should, the death sentencing rate among all death-eligible cases in the F–2 subcategory is only about ten percent, and the death sentencing rate for those proceeding to the penalty phase is only nineteen percent.

Given that no death sentence other than Morton's has been fully upheld (except Feaster's which the Court upholds today), we cannot conclude from the salient-factors test that there is a "societal consensus" that the death penalty is an appropriate penalty for F–2 defendants. *See State v. Cooper*, 159 *N.J.* 55, 72, 731 *A.*2d 1000 (1999) (*Cooper II* ).

### III.

### Comparative Culpability

A. *Defendant's Culpability*

1.

As I indicated in *Feaster, supra*, 165 *N.J.* at 447–48, 757 *A.*2d 266 (Long, J. dissenting), we should not engage in an abstract discussion of a defendant's "deathworthiness" based on subjective moral reasoning rather than comparative analysis. That said, I believe certain aspects of the Court's discussion of Morton's culpability are misleading and inappropriate. Throughout its discussion, the Court emphasizes that Morton committed murder to escape detection for the robbery. That emphasis is misplaced. I understand the aggravating nature of the "escape detection" factor in a case in which an eyewitness to a crime is killed to silence him, or in a case where the defendant returns, on a separate occasion, to eliminate the victim as a witness against him. Howev-

er, a defendant who kills a victim because she resists is no less culpable than a defendant who kills the same victim to escape detection.

Furthermore, the escape detection aggravating factor is so commonplace in robbery-murder capital cases that placing substantial weight on the presence of the factor as indicative of high culpability cannot be justified.

> Although this aggravating factor (c(4)(f)) is considered to increase defendant's moral blameworthiness, its widespread, almost universal application, regardless of the lack of evidence presented to establish it in various cases, destroys its efficacy as an appropriate aggravating factor. Its unbounded, amoebic application is inherently expansive, making it impossible to narrow the class of death-eligible defendants adequately to allow for meaningful distinctions regarding defendants' blameworthiness.
>
> [*State v. Harvey,* 159 *N.J.* 277, 386, 731 *A.*2d 1121 (1999) (*Harvey III* ) (Handler, J., dissenting).]

*Accord State v. Loftin,* 157 *N.J.* 253, 427–28, 724 *A.*2d 129 (1999) (*Loftin II* ) (Handler, J., dissenting), *cert. denied,* 528 *U.S.* 897, 120 *S.Ct.* 229, 145 *L.Ed.*2d 193 (1999). Indeed, the Court acknowledges that the "escape detection" motive is typical in felony-murder cases. *Ante* at 249–50, 757 *A.*2d at 192. In view of its prevalence in robbery-murder cases, the Court's emphasis on defendant's motive is distracting and troubling.

### 2.

Although it acknowledges that Morton did not engineer the crime, the Court does not consider his culpability diminished by his peripheral role. *Ante* at 252, 757 *A.*2d at 193. I disagree with that conclusion. Ten jurors found as mitigating that, "Robert Morton would not have committed the offenses for which he has been convicted were it not for Alonzo Bryant." Similarly, ten jurors found as mitigating that, "Robert Morton would not have participated in these offenses were it not for Alonzo Bryant." Those findings demonstrate that the jury believed Bryant was the catalyst for the crimes defendant committed.

A defendant's role in planning the murder is one of the components by which we measure his deathworthiness. *See, e.g., Harvey III, supra,* 159 *N.J.* at 309, 731 *A.*2d 1121. Indeed, in both *Cooper II, supra,* 159 *N.J.* at 90, 731 *A.*2d 1000, and *State v. Martini,* 139 *N.J.* 3, 75, 651 *A.*2d 949 (1994) (*Martini II* ), the Court considered the defendant's culpability to be enhanced because of his sole responsibility in planning the crimes he committed. A necessary corollary to that legal proposition is that a defendant whose role in planning the crimes is peripheral has diminished culpability. Thus, the Court's refusal to discount Morton's culpability is logically insupportable and contrary to this Court's precedent.

Moreover, it is fundamentally unfair to use a defendant's primary role in planning the crimes to aggravate his culpability, but not allow a defendant's secondary role to mitigate his culpability. That sort of one-way ratchet has no place in capital jurisprudence, in which defendants are entitled to enhanced, rather than diminished, procedural protections. *See Herrera v. Collins,* 506 *U.S.* 390, 399, 113 *S.Ct.* 853, 860, 122 *L.Ed.*2d 203, 216 (1993) ("In capital cases, we have required additional protections because of the nature of the penalty at stake.").

The Court's reliance on Morton's willingness to participate in the crimes to support its finding of high moral blameworthiness is unfounded. *See ante* at 252, 757 *A.*2d at 193. Morton's very death-eligibility is premised on his participation in the robbery-murder of Eck. Because voluntary participation in a crime is a universally applicable descriptor, it is useless as a comparative factor.

Finally, the Court concludes that Morton's "culpability in planning the murder should not be diminished because of the presence of a co-defendant." *Ante* at 252, 757 *A.*2d at 193. That statement disregards one crucial fact: Bryant's role cannot be defined as mere "presence." As the jury found, the crimes would have never occurred absent Bryant's participation. Bryant alone contrived the robbery and murder of Eck. Bryant's role in planning the

murder is unique among F–2 co-defendants and curtails Morton's culpability.

### 3.

The Court also improperly discounts the mitigating value of defendant's borderline intellectual functioning. In several proportionality reviews, the Court has found comparison case defendants' borderline intelligence mitigating. *See State v. Harris*, 165 *N.J.* 303, 339, 757 *A.2d* 221 (2000) (*Harris II*); *State v. Chew*, 159 *N.J.* 183, 217, 731 *A.2d* 1070 (*Chew II*), *cert. denied*, —— *U.S.* ——, 120 *S.Ct.* 593, 145 *L.Ed.2d* 493 (1999); *Cooper II, supra*, 159 *N.J.* at 95–96, 100, 112, 731 *A.2d* 1000; *Loftin II, supra*, 157 *N.J.* at 340, 724 *A.2d* 129. The Court even found someone's "cultural retardation" to mitigate, although that defendant was not mentally retarded. *See Harvey III, supra*, 159 *N.J.* at 318, 731 *A.2d* 1121; *id.* at 408 n. 25, 731 *A.2d* 1121 (Handler, J., dissenting) (discussing Herman Williams). Like Herman Williams, Morton is not mentally retarded but suffers from intellectual and emotional deficiencies that mitigate his moral blameworthiness. Morton's limited intellect is particularly relevant here because of his corresponding susceptibility to Bryant's leadership.

### 4.

One of the recurring problems we face in proportionality review is that of inconsistent coding of factors from case to case. *In re Proportionality Review Project*, 165 *N.J.* 206, 219, 757 *A.2d* 168 (2000) (*Proportionality Review II*). Sometimes it is caused by statutory changes or AOC policy, and sometimes by our own missteps. Such a misstep occurred in *Harvey III*, where we expanded the non-decedent victim factor and made it applicable to every case in which the victim was "a unique person" with "a web of familial relations"—in other words, to every single murder case. 159 *N.J.* at 313, 731 *A.2d* 1121 (cited at *ante* at 252, 757 *A.2d* at 193). What murder case does not involve a victim who was "a unique person"? How many decedents do not have "a web of familial relations"? A comparison factor that covers every con-

ceivable comparison case without distinguishing the culpability of any defendant has no utility and mars the integrity of precedent-seeking review. *Harvey III, supra,* 159 *N.J.* at 386, 731 *A.*2d 1121. The Court has cited that factor in this case. Given our significant responsibility in this endeavor, that was wrong. The universal non-decedent factor should be eliminated from future cases.

5.

The Court's abstract labeling of Morton's victimization and character also fails to hold up under scrutiny. The Court characterizes the victimization in this case as "exceptional." *Ante* at 252, 757 *A.*2d at 193. To be sure, Eck suffered unimaginable pain at the hands of Morton and Bryant. We do not know who inflicted the worst of the blows, but they are startling to any observer. The kind of pain suffered by Eck, however, is not unusual among murder victims. Of the thirty-one comparison cases under review, many victims suffered from excrutiatingly painful gunshot wounds and some were subject to horrific beatings. Wheeler's victim, like Eck, for example, was stabbed over ten times, while Hightower's victim was shot repeatedly as she tried to drag her wounded body off the ground. Simmons's victim was also stabbed and scalded with steaming hot water. Eck was terribly victimized, but highlighting his great pain and blood loss is not helpful if it is not done in a comparative manner.

With respect to Morton's character, his failure to show remorse or take responsibility for his actions are typical among similarly situated defendants and do not set Morton apart as particularly culpable. What is atypical about Morton is his lack of a criminal record. Unlike many F–2 defendants, Morton's crime was an aberration and the evidence suggests that he would not have deviated from his normally law-abiding life were it not for Bryant. The Court attempts to downplay the mitigating effect of Morton's lack of prior criminal history, but its effort is flawed in two respects. First, it is inequitable to conclude that a defendant is highly culpable based on a significant criminal history, *see, e.g.,*

*Harris II, supra,* 165 *N.J.* at 334–35, 757 *A.2d* 221, yet fail to downgrade the culpability of a defendant with no criminal history. Second, the Court points to the perceived threat felt by Morton's attorneys as evidence of unrelated acts of violence demonstrating bad character. *Ante* at 250, 254, 757 *A.2d* at 192, 194. That information was not before the jury and is not properly considered by us. *Martini II, supra,* 139 *N.J.* at 76, 651 *A.2d* 949 (refusing to consider, in analysis of defendant's culpability, evidence jury did not hear). Moreover, the grounds for that dispute are beyond the knowledge of anyone outside that attorney-client relationship and conjecturing about Morton's attorneys' perception of a threat can only insert more unreliability into proportionality review.

In sum, there is no place in proportionality review for an analysis of Morton's culpability separate and apart from precedent-seeking review. It serves only to prejudice precedent-seeking review and open the process to too many of our own subjective moral valuations. It would better serve the Court to begin our comparative culpability review with actual comparisons.

B. *Comparison Cases*

Our duty in this portion of proportionality review is to ensure that Morton has not been "singled out unfairly for capital punishment." *Cooper II, supra,* 159 *N.J.* at 88, 731 *A.2d* 1000 (quoting *Martini II, supra,* 139 *N.J.* at 47, 651 *A.2d* 949); *accord Chew II, supra,* 159 *N.J.* at 210, 731 *A.2d* 1070. Considering both Morton's crime and his character, it is our responsibility to determine whether the comparison cases in which a life sentence was imposed render his death sentence disproportionate. It is not our responsibility, and not even within our power, to determine whether Morton's death sentence was deserved on a moral level. Our inquiry should avoid that question at all costs, because it is all too tempting to determine proportionality based on the ugly facts of a particular crime.

Neither of the cases in Morton's comparison group that resulted in a death sentence is a good bench mark against which his sentence can be measured for disproportion. Hightower, who asked to be put to death, has had his death sentences reversed because of constitutional flaws. Feaster's sentence is clearly disproportionate and cannot be used to justify Morton's. *Feaster, supra,* 165 *N.J.* at 467, 757 *A.*2d 266 (Long, J., dissenting). Of the comparison cases that proceeded to a penalty trial, the majority resulted in life sentences; there is nothing obvious about Morton's case that explains why he was sentenced to death. Roger Hoyte's culpability was extraordinary. In three separate incidents over a period of two and one half weeks, Hoyte murdered three taxicab drivers, each of whom he and his co-defendants robbed. One of the victims who survived the initial gunshot inflicted on him died after Hoyte shot him two more times and then stabbed him. The Court concedes that those crimes were heinous, but strains to conclude that Hoyte's life sentences do not support Morton's disproportionality claim. *See ante* at 259, 757 *A.*2d at 197. I disagree.

Surely, a jury could find that a defendant who murdered three victims is highly culpable, indeed more so than a defendant who murders one victim. *See Harvey III, supra,* 159 *N.J.* at 408, 731 *A.*2d 1121 (Handler, J., dissenting); *Chew II, supra,* 159 *N.J.* at 272, 731 *A.*2d 1070 (Handler, J., dissenting); *Martini II, supra,* 139 *N.J.* at 100, 651 *A.*2d 949 (Handler, J., dissenting). The mitigating evidence in Hoyte's case cannot overcome the presumption that he, as a multiple murderer, is more culpable than Morton. As noted, Hoyte's motive of completing the robberies is not less culpable than Morton's motive of escaping detection. Hoyte's clean criminal record mirrors Morton's lack of a prior criminal history. Although Hoyte abused heroin, cocaine, or marijuana, he never alleged that he was intoxicated while he committed the crimes. Mere drug addiction does not substantially diminish deathworthiness. *See DiFrisco III, supra,* 142 *N.J.* at 204, 662 *A.*2d 442 (finding defendant highly blameworthy despite drug abuse). Indeed, drug abuse does not reduce a defendant's

culpability at all unless a connection between the addiction and the crime can be shown. *See Cooper II, supra,* 159 *N.J.* at 93, 731 *A.*2d 1000 (noting connection between drug addiction and homicide in comparison cases). Hoyte's cooperation with the police, his remorse, and his age may reduce his culpability, but those mitigating factors do not offset the fact that he killed three people.

David Russo also is extremely culpable in comparison with Morton. In a gas station, he announced a "stick-up," ordered three victims to lie on the floor, put a gun to their heads, and shot them. He killed one victim and caused another severe brain damage. Not surprisingly, the jury found the (4)(b) (grave risk of death to others) aggravating factor. The victimization in Russo's case greatly exceeds the victimization in Morton's case. Russo's depression, intoxication, and good jailhouse behavior do not render him less culpable than Morton, yet Russo received a life sentence.

Charles Williams, another defendant who shot multiple victims, is substantially more culpable than Morton. He forced three McDonald's employees to lie down at gunpoint while he stole money. He shot two of them in the head and shot at the third employee, who escaped unharmed. One of the victims died from the head wound while another sustained severe brain damage that permanently disabled him. The tremendous victimization in that case is matched by Williams's extraordinarily culpable character. He committed a plethora of prior offenses and was in prison for all but ninety-three days of his adult life. In other proportionality reviews, the Court has placed tremendous weight on a defendant's extensive prior record when deeming him highly deathworthy. *See Harris II, supra,* 165 *N.J.* at 326, 757 *A.*2d 221; *Harvey III, supra,* 159 *N.J.* at 314, 318, 731 *A.*2d 1121; *Chew II, supra,* 159 *N.J.* at 213, 731 *A.*2d 1070. Likewise, the Court has found a defendant's lack of a prior record to be a meaningful distinction justifying disparate sentences. *See, e.g., Harvey III, supra,* 159 *N.J.* at 318, 731 *A.*2d 1121. Williams's long criminal record, when contrasted against Morton's law-abiding history, magnifies Williams's relative culpability. Undoubtedly, the abuse Williams

suffered in his childhood is horrendous. However, in previous proportionality reviews, the Court has shown little sympathy for defendants who suffered similar abuse. *See, e.g., Cooper II, supra,* 159 *N.J.* at 90, 731 *A.*2d 1000. Viewed side by side, there is no objective way to rationalize the life sentence in Williams's case and the death sentence in Morton's.

Abdel Jaber Saleh was plainly more culpable than Morton and his life sentence provides powerful evidence of the disproportionality of Morton's death sentence. Saleh strangled his victim, hit him over the head with a crowbar, bound and gagged him with a metal chain, and set him on fire while he was still alive. Saleh subsequently stole 5000 videocassettes he had agreed to purchase from the victim. After fleeing to Los Angeles, Saleh told police that he had seen two Latino men burn somebody to death. The Court acknowledges that the degree of victimization in Saleh's case was "formidable." *Ante* at 259, 757 *A.*2d at 197. Although Saleh was three years younger than Morton at the time of their respective murders, and Saleh's jury found that his family would suffer emotional and psychological harm if he were executed, the victimization in Saleh's case exceeds that in any other case by a large degree.

Rafael Slaughter's life sentence suggests the disproportionality of Morton's death sentence because of the remarkable similarity between the cases. Slaughter confronted a fast-food restaurant employee behind the restaurant, put a gun to his head, forced him to go inside the restaurant to the safe, and shot him twice in the back after he was unable to give Slaughter the combination to the safe. The victim remained conscious for twelve minutes before bleeding to death. While toting his gun, Slaughter also ordered two other restaurant employees to lie on the ground. The Court concludes that because Slaughter was three years younger than Morton, was not motivated by a desire to avoid apprehension, and because his victim died more quickly than Eck, his life sentence is justifiable. *Ante* at 261, 757 *A.*2d at 198. I disagree. Slaughter's victim and Eck both suffered tremendously before dying; the fact

that Eck survived for an additional hour cannot rationally support disparate sentences. As discussed above, Slaughter's motive (completing the robbery) is not less culpable than Morton's motive of escaping detection. Last, although Slaughter's relative youth mitigates his culpability, it does not offset the increased victimization in his case. Accordingly, Slaughter's life sentence suggests that Morton's death sentence is disproportionate.

Three cases that never even made it to a jury also illustrate the disproportionality of Morton's sentence. Ronald Wheeler pled guilty to felony murder for assaulting the office manager where he worked, stabbing her to death after she, refused to give him his Christmas bonus, then stealing her pocketbook and some petty cash. Because of the nature of the stabbing, the AOC narrative concludes that Wheeler intended to torture the victim in addition to killing her. I agree with the Court's conclusion that the victimization in Wheeler's case is similar to the victimization in Morton's case. See ante at 259, 757 A.2d at 197. However, I disagree that Wheeler's motive was benign when he barged into the victim's office. Wheeler's possession of a knife and his violent reaction to the victim's refusal to give him the bonus suggests that the robbery was premeditated. Even if Morton's crime was more premeditated than Wheeler's, Wheeler's role in planning his crime renders him as culpable as Morton. In either case, Wheeler's sentence of forty years in prison, with a possibility of parole after thirty years, is indicative of the disproportionality of Morton's death sentence.

When robbing a gas station, Harold Rodriguez shot the owner and a customer. The owner recovered from his injuries after two and a half weeks of hospitalization, but the customer died. While that murder was under investigation, Rodriguez shot a woman in another robbery. Although Rodriguez said he used heroin and cocaine on a daily basis, he did not claim to be intoxicated at the time of the crime. Accordingly, the Court's reliance on the presence of the (5)(d) factor, see ante at 266, 757 A.2d at 201, is

flawed. I concur with the Court's finding that Rodriguez's bout with AIDS is mitigating. *Ibid.* However, the aggravation in Rodriguez's case nevertheless renders him more culpable than Morton. Rodriguez was able to enter into a plea bargain for a term of life imprisonment, with the possibility of parole after thirty years, in exchange for pleading guilty to murder, conspiracy to commit murder, attempted murder, two counts of robbery, unlawful possession of a weapon, and possession of a weapon for an unlawful purpose.

The Court acknowledges that Corey Washington, another similarly situated defendant who was permitted to enter a plea to avoid the death penalty, appears as culpable as Morton. *Ante* at 261, 757 *A.2d* at 198. Although Washington was six years younger than Morton at the time of his offense, he had at least as significant a role in planning the crime as his co-defendants. Washington and his co-defendants made the victim and his sixty-eight-year-old co-worker lie on the floor while the perpetrators removed money from a safe. Presumably, the victim and his co-worker feared for their lives during that period. Their fears were realized when Washington fatally shot the victim and a co-defendant shot the co-worker. Thus, I agree with the Court that Morton is not more culpable than Washington. *Ante* at 262, 757 *A.2d* at 199. Morton's death sentence, as contrasted with Washington's sentence of thirty years imprisonment, suggests disproportionality.

In sum, I find that Roger Hoyte, David Russo, Abdel Jaber Saleh, Rafael Slaughter, Ronald Wheeler, Charles Williams, Harold Rodriguez, and Corey Washington are all at least as culpable or more culpable than Morton. Yet, those eight comparison perpetrators have received sentences of life imprisonment or less, while Morton was singled out for the death penalty.

I recognize that "[d]isparity alone does not demonstrate disproportionality," *State v. Bey,* 137 *N.J.* 334, 386, 645 *A.2d* 685 (1994) (*Bey* IV), and that proportionality review "is not intended to ensure that one killer's sentence is identical to all other similarly

categorized killers," *Harvey III, supra,* 159 *N.J.* at 319, 731 *A.*2d 1121. Rather, "[p]roportionality review seeks to determine whether a particular death sentence is aberrational." *In re Proportionality Review,* 161 *N.J.* 71, 76, 735 *A.*2d 528 (1999) (*Proportionality Review I* ) (quoting *Bey IV, supra,* 137 *N.J.* at 352, 645 *A.*2d 685). Although, like Justice Handler, I disagree with the meaning the Court has ascribed to the notion of "aberration" (i.e., extreme disproportion), *id.* at 104–05, 735 *A.*2d 528 (Handler, J., concurring in part and dissenting in part), even accepting its vision of that term in this case, in which Morton is as culpable or less culpable than eight life-sentenced defendants in his comparison group, I believe he has demonstrated that his death sentence is disproportionate.

The other cases in defendant's comparison group neither support nor detract from Morton's showing of disproportionality. Some present less victimization than Morton's but involve a defendant who acted alone or as the dominant participant with other co-defendants. It is, of course, difficult to compare the mitigating evidence in the comparison cases with Morton because of how little we know about Morton's background and character. He was uncooperative with the lawyers who, in turn, failed to present a single witness to persuade the jury to spare Morton's life. Nonetheless, what we do know about Morton mitigates his culpability relative to other defendants with more sophisticated intellects and more opportunity to direct the actions around them. Carl Culley, for example, was younger and caused less suffering than Morton; he was an alleged victim of sexual abuse. However, Culley planned a robbery alone and had committed two prior offenses and therefore does not detract from Morton's disproportionality claim.

Despite Tim Harris's youth and the lower victimization in the murder he committed, his lengthy juvenile record, failure to finish high school, inability to hold a steady job, and role as at least an equal planner of a robbery-murder make him as culpable as Morton. The same may be said about Donald Loftin, whose

murder of a chambermaid involved less victimization than Morton's, but who planned his entire offense alone.

Frederick Simmons committed an offense involving a level of victimization similar to Morton. In the midst of a robbery, Simmons beat, stabbed, and stomped a man to death at a bar, and kicked another man in the head. Simmons was thirty-five years old and unemployed when he committed the crimes, and apparently had an equal role to that of his co-defendant in planning the crime. Aside from Simmons's depression and personality disorders, there are several similarities between Morton and Simmons, as the Court notes. *Ante* at 260, 757 *A.*2d at 198. Although the Court emphasizes Simmons's intoxication to justify the disparity between Simmons and Morton, *ante* at 260, 757 *A.*2d at 198, that distinction is belied by the jury's rejection of the (5)(d) (diminished capacity) mitigating factor. Due to their intoxication, John Downie, Craig Hart, Anthony Inman, and Khalif James appear less culpable than Morton. Nevertheless, the presence of four less culpable life-sentenced cases in Morton's comparison group does not preclude a finding of disproportionality. A defendant should not have to be the least culpable person in his comparison group in order for his death sentence to be considered an aberration.

## IV.

In a pool of fifteen cases that both the State and Morton consider to be ripe for comparison, the presence of seven life-sentenced cases in which the perpetrator is at least as culpable as the death-sentenced defendant suffice to show that Morton's death sentence is aberrational.[1] We have often emphasized that proportionality review guarantees that a defendant has not been "singled out unfairly for capital punishment." *Chew II, supra,* 159 *N.J.* at 210, 731 *A.*2d 1070 (internal quotations omitted). When a defen-

---

[1] There are only seven because the State disagreed with the inclusion of Rodriguez in the comparison.

dant receives a death sentence, but most similarly situated defendants receive life sentences, he has been singled out unfairly for death.

Under the Court's proportionality standard, an occasional sentencing disparity is permissible. However, the case comparisons here offer example after example of the disparity between Morton and other similarly situated defendants who escaped death. Therefore, Morton has demonstrated that his death sentence is aberrant and, thus, disproportionate.

Accordingly, I dissent.

*For affirmance*—Chief Justice PORITZ and Justices O'HERN, STEIN, COLEMAN and LaVECCHIA—5.

*To vacate and for remandment*—Justice LONG—1.